PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVID CLAYTON HILL,
            *Petitioner-Appellant,*

v.

JON E. OZMINT, Director, South
Carolina Department of Corrections;
HENRY DARGAN MCMASTER,
Attorney General, State of South
Carolina,

            *Respondents-Appellees.*

No. 03-1

Appeal from the United States District Court
for the District of South Carolina, at Beaufort.
G. Ross Anderson, Jr., District Judge.
(CA-02-1319-9-13BG)

Argued: June 5, 2003

Decided: August 5, 2003

Before MICHAEL, MOTZ, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Michael and Judge Motz joined.

---

## COUNSEL

**ARGUED:** Jerome Howard Nickerson, Jr., CENTER FOR CAPITAL
LITIGATION, Columbia, South Carolina, for Appellant. Donald John
Zelenka, Assistant Deputy Attorney General, Columbia, South Caro-

lina, for Appellees. **ON BRIEF:** Michael O'Connell, STIRLING & O'CONNELL, Charleston, South Carolina, for Appellant. Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Columbia, South Carolina, for Appellees.

---

**OPINION**

KING, Circuit Judge:

In October of 1995, David Hill was sentenced to death for the murder of Major Spencer Guerry, the Deputy Police Chief for the City of Georgetown, South Carolina. After the South Carolina courts denied relief on both direct appeal and collateral review, Hill sought habeas corpus relief in the District of South Carolina. The district court denied relief, and it declined to issue a certificate of appealability ("COA").[1] In this proceeding, however, we have issued a COA on the following habeas corpus claims: (1) that the trial court violated the Constitution in refusing to grant a trial continuance; (2) that the presence of numerous uniformed law officers in the courtroom and courthouse during the trial was unconstitutional; (3) that the district court erred in refusing to conduct an evidentiary hearing or authorize discovery on the presence of officers in the courtroom and courthouse; and (4) that Hill's lawyers were constitutionally ineffective in calling Hill's psychiatrist during the trial's sentencing phase. As explained below, we reject each of these claims, and we affirm the district court's denial of habeas corpus relief.

I.

A.

In the early evening of March 7, 1994, Major Spencer Guerry,

---

[1]Section 2253(c) of Title 28 of the United States Code provides that, unless "a circuit justice or judge issues a [COA], an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C. § 2253(c).

Georgetown's thirty-seven year old Deputy Police Chief, ate supper with his wife and children at a Shoney's Restaurant in Georgetown. At approximately 7:00 p.m., Guerry left the restaurant to return to police headquarters. While driving in his police cruiser on High Market Street, Guerry observed a Honda Prelude travelling ahead of him with an expired Colorado license plate. Guerry promptly illuminated his blue flashing lights, and the Honda pulled into a parking lot at the Georgetown Car Wash. Guerry exited his cruiser and approached the Honda, requesting that the driver, David Hill, provide his driver's license and the Honda's registration card. Although unable to produce a license, Hill provided Guerry with identification and the Honda's registration card. Guerry then returned to his police cruiser and radioed Hill's information to headquarters.

While awaiting a response from headquarters, Major Guerry again approached the Honda, instructing Hill to exit the vehicle. At that time, Guerry was shot in the face with Hill's gun. Although he was mortally wounded, Guerry managed to use the radio on his shoulder strap to call for assistance. As indicated on a tape recording made at headquarters, he muttered only a few words, including "6-9" (the code for the dispatcher at headquarters was 6-9-1) and "-eh shot me." Soon after this transmission, emergency personnel arrived on the scene and transported Guerry to the Medical University of South Carolina, where he died several days later.

Prior to the arrival of emergency personnel, Hill fled the scene of the shooting. Driving the Honda, he first went to his home on McDonald Road in Georgetown, where he picked up his girlfriend, Wendy Richardson. Richardson and Hill then went to the nearby home of Hill's parents, Gracie and Arthur Hill. Gracie and Richardson then followed Hill in Gracie's car as Hill drove to Johnson Road in Georgetown, where he abandoned the Honda in a ditch. After returning briefly to his parents' home, Hill departed again, leaving Richardson with his parents.

In the meantime, police investigators had begun to search for Hill and the Honda. Armed with the information that Major Guerry had transmitted to headquarters before being shot, officers searched Hill's house on McDonald Road. Afterward, they went to the home of Hill's parents. By the time they arrived, Hill had abandoned the Honda,

returned with Gracie and Richardson, and left again. The officers spoke with both Gracie and Richardson and searched the residence. As they were leaving, they requested that Gracie and Richardson have Hill contact the authorities.

Approximately fifteen minutes after the investigators departed, Hill returned to his parents' home with his clothes covered in mud. After Gracie informed him that the police had been there and were looking for him, Hill showered and poured Clorox on his hands. He then phoned the police and advised them that the Honda had been stolen. Investigators responded immediately, arresting Hill and transporting him to headquarters.

At headquarters, investigators performed trace metal tests on Hill's hands, revealing that Hill had recently fired a gun. After waiving his *Miranda* rights, Hill advised investigators that, earlier that afternoon, he had fought with his girlfriend. Afterwards, he had walked from his home to his parents' residence and had fallen asleep while reading a magazine in a nearby shed. Upon awakening, Hill entered his parents' home, where Gracie informed him that the authorities were looking for him. He then called the police. Skeptical of Hill's statements, investigators questioned him regarding the precise timing of these events. Hill then requested a lawyer, and investigators terminated the interview. That evening, investigators found the abandoned Honda. They also visited a nearby Exxon station and recovered a credit card receipt bearing Hill's signature. The receipt was time-stamped at 6:00 p.m. on March 7, 1994 — an hour before the shooting.

On April 20, 1994, Hill was indicted in Georgetown County for the murder of Major Guerry. Pursuant to § 16-3-26 of the South Carolina Code, the State notified Hill's lawyers that it would seek the death penalty. Trial proceedings began on Monday, October 23, 1995, and by Wednesday morning, October 25th, jury selection had been completed. Given the publicity surrounding Guerry's death and Hill's prosecution, the court sequestered the jury for the duration of the trial. During its case-in-chief, the State presented substantial evidence of Hill's guilt, including, *inter alia*: eyewitness testimony; forensic evidence; and testimony from other witnesses, including Richardson. By noon on Saturday, October 28, 1994 — the fourth day of evidence — the State rested its case, having presented more than forty witnesses.

In his defense, Hill presented the testimony of officers involved with Major Guerry's last radio transmission, as well as the testimony of a trace metal expert. Hill also testified on his own behalf. By the time of trial, his version of the critical events had changed substantially from the statement he made to police on the night of his arrest. Specifically, Hill admitted in his trial testimony that he was in the Honda at the time of Guerry's shooting. He claimed, however, that another person, Johnny Cribb — a friend to whom he owed $16,000 because of a drug deal gone awry — shot Guerry. On the day of the shooting, Hill had travelled to Pawleys Island, South Carolina, to purchase marijuana. While driving back to Georgetown, he picked up Steve Blankenship, an individual with whom Hill and Cribb associated. After entering the Honda, Blankenship threatened Hill with a pistol and forced him to drive to a Ramada Inn near Georgetown. Blankenship also removed Hill's handgun from the Honda's glove box.

At the Ramada Inn, Cribb met Hill and Blankenship, and Blankenship gave Cribb both weapons. Cribb entered the Honda and informed Hill that they had some "unfinished business." At this point, Cribb aimed a weapon at Hill and instructed him to drive to Hill's home on McDonald Road. On the way, Hill and Cribb were pulled over by Major Guerry. During the traffic stop, Cribb, who was hiding in the Honda's back seat, leaned into the front and shot Guerry with Hill's handgun. After the shooting, Hill and Cribb drove to Brick Chimney Road in Georgetown and met Blankenship. Cribb forced Hill to exit the Honda and had him fire a handgun into the woods. Afterward, Cribb left with Blankenship, and Hill returned in the Honda to his own home. He then met Richardson and proceeded with her to his parents' home before abandoning the Honda on Johnson Road.

By approximately 4:30 p.m. on Saturday, October 28, 1994, Hill had completed his testimony. His next witness was to be Dr. Stephen Cain, an expert from Wisconsin. Due to unforeseen circumstances, however, Dr. Cain was unable to be in Georgetown that afternoon or evening. Given Dr. Cain's unavailability, the defense sought a continuance until Monday morning so that Dr. Cain could testify. After the court denied the continuance, the defense rested its case. Closing arguments in the trial's guilt phase were made on Saturday evening, and the court instructed the jury on Sunday morning. The jury then

deliberated for about forty-five minutes on Sunday before finding Hill guilty of murder.

On Monday, October 30, 1995, the trial's sentencing phase began. At that time, the State presented several witnesses, including police officers, Major Guerry's wife, and Richardson. The defense began presenting its evidence Monday afternoon, calling, *inter alia*, three experts: Dr. Emil Coccaro, Dr. Bernard Albiniak, and Dr. Joseph Burt. Each of these experts testified that Hill suffered from a treatable neuro-chemical disorder. On Tuesday morning, October 31st, Hill's mother testified. After closing arguments, the jury again deliberated and returned its verdict recommending that Hill be sentenced to death. The trial court accepted the jury's recommendation and imposed the death sentence.

## B.

Pursuant to South Carolina's rules governing direct appeals, Hill appealed his conviction and sentence directly to the Supreme Court of South Carolina. On June 8, 1998, that court upheld Hill's conviction and death sentence. *State v. Hill*, 501 S.E.2d 122 (S.C. 1998). On December 7, 1998, the Supreme Court of the United States denied certiorari. *Hill v. South Carolina*, 525 U.S. 1043 (1998).

On May 6, 1999, Hill filed an Application for Post-Conviction Relief (the "PCR") in the Court of Common Pleas for Georgetown County (the "PCR Court").[2] After conducting a four-day evidentiary hearing on Hill's claims, the PCR Court dismissed the PCR. *Hill v. Catoe*, 99-CP-22-268, Order of Dismissal of Application for Post Conviction Relief (S.C. Ct. C.P. Dec. 18, 2000) (the "PCR Order"). On April 18, 2002, the Supreme Court of South Carolina declined to review the PCR Order, and the Supreme Court of the United States thereafter denied certiorari. *Hill v. Maynard*, 123 S. Ct. 442 (2002).

---

[2]On March 11, 2000, and again on March 22, 2000, Hill amended his PCR to assert additional claims for relief. As cited herein, we refer to the PCR as amended.

## C.

On April 22, 2002, Hill filed his petition for habeas corpus (the "Petition") in the District of South Carolina.[3] Pursuant to 28 U.S.C. § 636(b), the district court referred the Petition to a magistrate judge, who conducted an extensive evaluation of Hill's claims and recommended that the Petition be dismissed. *Hill v. Maynard*, 9:02-1319-11BG, Report and Recommendations of the Magistrate Judge (D.S.C. Sept. 20, 2002) (the "Magistrate Report"). On November 18, 2002, the district court adopted the Magistrate Report and dismissed the Petition. *Hill v. Maynard*, 9:02-1319-13BG, Order (D.S.C. Nov. 18, 2002) (the "Order").

Although the district court denied Hill's request for a COA, we issued him a COA on the following habeas corpus claims:

(1)   that the state trial court violated the Sixth Amendment in failing to grant Hill a one-day continuance (the "Continuance claim");

(2)   that the presence of numerous uniformed law officers in the courtroom and courthouse during the trial violated Hill's right to a fair trial (the "*Holbrook* claim"[4]);

(3)   that the district court erred in refusing to conduct an evidentiary hearing or to authorize discovery on the *Holbrook* claim (the "Discovery claim"); and

(4)   that Hill's lawyers were constitutionally ineffective in calling Dr. Burt, Hill's psychiatrist, as an expert witness during the trial's sentencing phase (the "IAC claim").

---

[3]Hill amended the Petition on June 28, 2002, to add six additional grounds for relief. In referring to the Petition, we are referring to it as amended.

[4]The *Holbrook* claim is premised on the Supreme Court's decision in *Holbrook v. Flynn*, 475 U.S. 560, 571-72 (1986) (observing that "a roomful of uniformed and armed policemen" can, in certain situations, "pose [a threat] to a defendant's chances of receiving a fair trial").

*Hill v. Ozmint*, No. 03-1, Order (4th Cir. May 28, 2003). After discussing the applicable standards of review, we will assess the merits of each of these claims.

## II.

We review de novo a district court's "decision on a petition for writ of habeas corpus based on a state court record." *Basden v. Lee*, 290 F.3d 602, 608 (4th Cir.), *cert. denied*, 123 S. Ct. 446 (2002) (internal quotation marks omitted). Additionally, we review for abuse of discretion a district court's refusal to conduct an evidentiary hearing or to authorize discovery proceedings. *Thomas v. Taylor*, 170 F.3d 466, 474-75 (4th Cir. 1999).

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in a decision that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court has explained, a state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Finally, a state court's findings of fact are entitled to a "presumption of correctness," which a petitioner may rebut only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.   The Continuance claim

Hill asserts in his Petition that the trial court violated his Sixth Amendment right to present his defense to the indictment in refusing

to grant a continuance from Saturday evening until Monday morning so that he could introduce Dr. Cain's testimony and an enhanced version of Guerry's final radio transmission.[5] The Supreme Court of South Carolina summarily denied the Continuance claim, and the district court ruled that the claim had been procedurally defaulted. We have issued a COA on this claim. Although we agree with Hill's contention that he has preserved his right to assert the Continuance claim, the state court's resolution of it was neither "contrary to" nor an "unreasonable application of" clearly established federal law, and we therefore decline to award habeas corpus relief on this claim.

## A.

As background, we review the factual predicate for this claim. At 5:40 p.m. on Friday, October 27, 1994 — the fifth trial day — the State informed the court that it had exhausted its available witnesses. Because its final four witnesses would not be available until Saturday morning, the State sought an overnight recess. The court granted the continuance, and the trial was recessed until 9:00 a.m. on Saturday morning. In moving for a continuance, the prosecution stated that it was likely to rest its case on Saturday morning. Hill's lawyers, however, had anticipated that the State's case-in-chief would last at least through Saturday. Accordingly, they had planned to begin Hill's defense no earlier than Monday of the following week. On Friday, after receiving notice that the prosecution would probably rest its case the next day, Hill's lawyers altered their plans and prepared to present defense witnesses on Saturday afternoon.

As discussed above, Hill asserted that Cribb had also been in the Honda at the time of the incident and that Cribb had shot Major Guerry. In support of this assertion, the defense contends that, in the

---

[5]The Sixth Amendment provides that an accused has "the right to a speedy and public trial[;] to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor[;] and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Pursuant to this provision of the Constitution, an accused has a fundamental right to present a defense to a criminal charge. *Herring v. New York*, 422 U.S. 853, 856-57 (1975).

garbled post-shooting radio transmission to headquarters, Guerry actually said "they shot me" rather than "-eh shot me." The defense had retained Dr. Cain, a forensic tape analyst from Wisconsin, to enhance the recording of Guerry's final transmission. Dr. Cain's expert testimony was to establish the foundation for admission of the enhanced recording, which Hill hoped would convince the jury that Guerry had said "they shot me." On Friday, October 27th, the defense contacted Dr. Cain, who was in Nevada attending a conference with an assistant. Dr. Cain advised Hill's lawyers that he would complete his business in Nevada and fly to Georgetown either that evening or Saturday morning. After Dr. Cain purchased his airline ticket for Georgetown, however, his assistant became violently ill, collapsed, and was rushed to a hospital. As a result, Dr. Cain was unable to leave Nevada, and he thus informed the defense late on Friday evening that he could not be in Georgetown to testify on Saturday.[6]

When the trial court convened on Saturday morning, Hill's lawyers informed the judge that they would be unable to present Dr. Cain's testimony until Monday, and they thus moved for the trial to be continued until Monday morning. The court reserved ruling on the continuance motion in order to see how the trial progressed. After presenting its final witness, the State rested its case at about noon on Saturday. By 4:40 p.m. that afternoon, Hill's lawyers had exhausted their available witnesses, and the defense team had been unable to secure Dr. Cain's presence. Thus, the defense renewed its motion for a continuance, seeking to have the trial continued until Monday morning when Dr. Cain would be available to testify. The court denied the one-day continuance, stating that it: "simply cannot wait until Monday morning. It is Saturday. According to my [watch] it is approximately twenty-two [until] five, and the court declines to recess the trial until Monday morning." Hill's defense thus rested its case without presenting Dr. Cain's testimony or introducing the enhanced tape of Guerry's final radio transmission.

---

[6]On Saturday morning, Dr. Cain advised Hill's lawyers that his assistant's condition had improved, and that he could testify on Monday.

B.

In his direct appeal to the Supreme Court of South Carolina, Hill maintained that, in denying his continuance motion, the trial court contravened his Sixth Amendment right to present a defense. The court summarily rejected that claim, relying on *State v. Babb*, 385 S.E.2d 827 (S.C. 1989), for the proposition that the denial of a motion for a trial continuance will not be disturbed absent a clear abuse of discretion resulting in prejudice. *Hill*, 501 S.E.2d at 128. In his Petition, Hill again contends that the trial judge violated the Sixth Amendment in denying his continuance motion. The district court rejected the Continuance claim on the basis that, because the Supreme Court of South Carolina's ruling rested on state law, the claim had been procedurally defaulted and could not be raised in a federal habeas corpus proceeding.[7] Order at 8-10. We have issued a COA on this claim.

Hill raises several subissues with respect to his Continuance claim. First, he asserts that the district court erred in deciding that the claim had been procedurally defaulted. Second, he maintains that there was no state court adjudication "on the merits," and that we should therefore review the Continuance claim de novo. Finally, Hill contends that he is entitled to habeas corpus relief because the trial court's ruling contravened his Sixth Amendment right to present a defense. We examine each of these subissues in turn.

1.

First, we agree with Hill that the district court erred in ruling that the Continuance claim was procedurally defaulted. It is true, of course, that when "a state court has declined to consider [a claim's] merits on the basis of an adequate and independent state procedural rule," *Burket v. Angelone*, 208 F.3d 172, 183 (4th Cir. 2000), federal habeas corpus review of that claim is barred unless the petitioner can demonstrate cause and prejudice, or otherwise show that the failure

---

[7]For purposes of the Continuance claim and the *Holbrook* claim, we use the term "state court" to refer to the Supreme Court of South Carolina. With respect to Hill's final claim, i.e., the IAC claim, our use of "state court" refers to the PCR Court.

to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this instance, however, the state court did not dispose of the Continuance claim on the basis of a state procedural rule. Rather, it considered the merits of the claim, ruling that, under South Carolina law, the "denial of [a] motion for continuance will not be disturbed absent clear abuse of discretion resulting in prejudice." *Hill*, 501 S.E.2d at 128. Applying this standard to the Continuance claim, the court found no reversible error. In short, the state court did not determine that Hill had procedurally defaulted his Continuance claim; it rejected the claim on its merits.

2.

Hill next asserts that, even though the state court rejected the Continuance claim, we should nevertheless review the claim de novo because the state court failed to address and rely on the relevant Supreme Court precedents. In other words, Hill contends that, because the state court referenced only state law in resolving this claim, it failed to "adjudicate" it "on the merits." Contrary to this assertion, a state court may adjudicate a claim "on the merits" without relying on or citing relevant Supreme Court precedents. *See Early v. Packer*, 537 U.S. 3, 123 S. Ct. 362, 365 (2002) (applying AEDPA deference to claim that state court disposed of without citing controlling Supreme Court precedent; thus implicitly concluding that claim was adjudicated on merits); *see also Cook v. McCune*, 323 F.3d 825, 830-31 (10th Cir. 2003) (holding that, under *Early*, state court decision was entitled to deference under AEDPA even though Sixth Amendment claim was reviewed under state law rather than relevant Supreme Court authority). In this situation, the state court, in rejecting Hill's claim, adjudicated it on the merits, regardless of whether it referenced relevant federal law. We must therefore apply AEDPA's deferential standard of review in our assessment of this claim. That is, we limit our review to deciding whether the state court's adjudication was "contrary to" or an "unreasonable application of" clearly established federal law.

3.

In assessing the Continuance claim, we must first identify the legal standards applicable to a defendant's contention that a trial court vio-

lated the Constitution in refusing to grant a continuance. A defendant must satisfy two elements in order to secure relief on such a claim. First, he must establish that the trial court "abused its discretion" in denying his continuance motion. *Ungar v. Sarafite*, 376 U.S. 575, 588-89 (1986); *Morris v. Slappy*, 461 U.S. 1, 11 (1964). Although a "matter of continuance is traditionally within the discretion of the trial judge," a trial court is not entitled to deny a continuance because of a "myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar*, 376 U.S. at 589. Second, to be entitled to relief, the defendant must establish that the trial court's erroneous ruling prejudiced his defense. *United States v. Colon*, 975 F.2d 128, 130-31 (4th Cir. 1992).

In its resolution of Hill's direct appeal, the state court failed to provide the rationale for its decision to deny relief, and we are unable to ascertain whether its ruling was premised on the abuse of discretion issue or on the prejudice issue. Accordingly, we are obliged to independently review the record and decide whether the state court's rejection of the Continuance claim was "'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Bell v. Jarvis*, 236 F.3d 149, 157-58 (4th Cir. 2000) (en banc) (quoting 28 U.S.C. § 2254). In this situation, we are necessarily troubled by the trial court's refusal to continue Hill's murder trial from Saturday evening to Monday morning. That said, Hill is unable to demonstrate that he was prejudiced thereby. Thus, the state court's decision in rejecting the Continuance claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law.

At the time they sought a continuance, Hill's lawyers provided a credible and compelling justification for the need to delay the trial. They gave the court a reasonable explanation for Dr. Cain's unavailability; they summarized Dr. Cain's anticipated testimony and its relevance; and they informed the court that Dr. Cain would be available to testify on Monday morning. The trial court's refusal to grant Hill's continuance request also evinces an apparent inequity in the court's treatment of the parties. Where the prosecution asked for a continuance, it was granted, but when Hill requested one, it was denied. Finally, the trial court's refusal to grant Hill a continuance appears to have been made arbitrarily. In rejecting the continuance motion, the court merely stated that it "simply [could not] wait until Monday

morning." In these circumstances, the denial of Hill's continuance request seems to have resulted from what the Supreme Court has characterized as "a myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar*, 376 U.S. at 589.

Nevertheless, Hill cannot show that he suffered any prejudice from the trial court's ruling. To be sure, Hill was precluded from introducing Dr. Cain's testimony and the enhanced tape, but as Dr. Cain acknowledged during the PCR proceedings, the enhanced tape would not have aided the jury in deciphering Guerry's garbled transmission. In fact, both the original tape and the enhanced tape were, as the PCR Court found, indecipherable. PCR Order at 8.[8] We thus conclude that neither Dr. Cain's testimony nor the introduction of the enhanced tape would have aided Hill's defense. *See Gardner v. Barnett*, 199 F.3d 915, 920 (7th Cir. 1999) (refusing to award relief because denial of continuance did not affect verdict when excluded witness's testimony would not have aided defense). Accordingly, the state court's rejection of the Continuance claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law.

## IV.   The *Holbrook* claim and the Discovery claim

In his *Holbrook* claim, Hill maintains that he was denied his right to a fair trial because of the large number of uniformed police officers present in the courtroom and courthouse during his trial.[9] More specifically, he alleges that, "in an environment saturated by pretrial publicity and rampant with emotionalism in a small community," the trial court violated his right to a fair trial, as guaranteed by the Fourteenth Amendment,[10] by allowing "a multitude of uniformed officers" to be

---

[8]The PCR Court's finding of fact on this point is, under AEDPA, entitled to a presumption of correctness. 28 U.S.C. § 2254(e).

[9]In utilizing the phrase "the courtroom," we are referring to both the courtroom and its adjacent hallways — where the presence of uniformed law officers may have been observed by the jurors.

[10]The Fourteenth Amendment provides, in pertinent part, that no "State shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The right of an accused to a fair trial is an essential requirement of due process. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).

present during the trial. Petition at 29. In the alternative, Hill asserts in his Discovery claim that the district court erred in denying the *Holbrook* claim without affording him an opportunity to develop the record through an evidentiary hearing or discovery proceedings. Specifically, Hill contends that an evidentiary hearing or discovery would have permitted him to establish — by way of videotape recordings of the trial — the number of police officers present during his trial, and thus show that their presence interfered with his right to a fair trial. We issued a COA on both the *Holbrook* claim and the related Discovery claim. For the reasons explained below, however, we reject these claims.

A.

During voir dire, Hill asserted to the trial court that the presence of numerous uniformed law officers in the courtroom was inherently prejudicial, improperly suggesting to the jury that he was guilty. During a hearing on this issue — on Tuesday, October 24th — Hill cited two examples to support his contention. First, he maintained that, earlier that morning, six law officers were present in the hallway adjacent to the courtroom and that, as a result, the jury had to walk through a "gauntlet" of law officers. Second, Hill contended that the presence of security officers in the courtroom could unfairly prejudice the jury.[11] Upon questioning from the court, however, Hill conceded that not all of the six individuals in the adjacent hallway were uniformed law enforcement. In fact, Hill's count of six officers included bailiffs and individuals who worked in the prosecutor's office. Similarly, not all of the security officers in the courtroom were in uniform. For example, an officer near the judge was dressed in a coat and tie. In these circumstances, the court rejected Hill's contention that the presence of uniformed law officers in the courtroom was unfairly prejudicial.[12]

---

[11]For example, two uniformed officers were present with Major Guerry's widow, an officer was positioned near the trial judge, and another officer was present in a corner of the courtroom.

[12]During the trial's sentencing phase, Hill again asserted to the trial court that an array of uniformed law officers in the courtroom prejudiced the jury against him. After discussing the issue with the court, Hill's lawyers conceded that the presence of the law officers in the courtroom would not deny Hill a fair sentencing. Hill has not further contested the trial court's ruling regarding the presence of uniformed law officers during sentencing. *Hill*, 501 S.E.2d at 125.

On direct appeal, Hill contended that the presence of uniformed law officers during his trial's guilt phase violated his constitutional right to a fair trial. Seeking support for this claim, Hill requested that the Supreme Court of South Carolina empower him to subpoena videos made by television stations that had covered his trial. The court refused to authorize the discovery of such videos because, pursuant to Rule 605 of the South Carolina Appellate Rules of Procedure, they would not have been admissible in any state court proceeding. The court also concluded that Hill had failed to make the necessary showing that he suffered actual or inherent prejudice from the presence of uniformed law officers, and it therefore rejected the *Holbrook* claim. *Id.* at 126.

In denying the Petition, the district court declined to conduct an evidentiary hearing on this claim, and it also refused to authorize Hill to conduct discovery on this point, reasoning that the "introduction of the videotapes would not have aided any relevant evidence not already contained within the record."[13] Order at 24. The court also concluded that, in adjudicating the *Holbrook* claim, the state court decision was neither "contrary to" nor an "unreasonable application of" clearly established federal law. Order at 22.

B.

We agree that the state court's decision on the *Holbrook* claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d). It is true, of course, that an accused is "entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). Thus, for example, absent an essential state

---

[13]In the alternative, the district court ruled that Hill was barred from using the videotapes in federal court because the state court had refused to consider them on the basis of a state procedural rule. Order at 25. Because we conclude that Hill has failed to make the necessary showing required to obtain discovery or to obtain an evidentiary hearing in a federal habeas corpus proceeding, we need not consider whether he was procedurally barred from using the videotapes as evidence.

interest, it is inherently prejudicial and unconstitutional to compel a defendant to wear shackles in the presence of a jury. *See Illinois v. Allen*, 397 U.S. 337 (1970).

Applying the principle enunciated in its *Taylor* decision, the Court has also concluded that "a roomful of uniformed and armed police-men might pose [a threat] to a defendant's chances of receiving a fair trial." *Holbrook v. Flynn*, 475 U.S. 560, 570-71 (1986). In *Holbrook*, the Court acknowledged that, unlike the use of courtroom shackles, the presence of identifiable security officers does not inherently preju-dice a defendant. *Id.* at 569. The Court recognized that "[j]urors may just as easily believe that the officers are there to guard against dis-ruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." *Id.* Accordingly, in ascertaining whether the presence of uniformed law officers during a criminal trial was so overwhelming as to be unconstitutional, a reviewing court must assess whether there was "an unacceptable risk . . . of impermissible factors coming into play." *Id.* at 570 (internal quotation marks omitted). Under this standard, a *Holbrook* claim is difficult to establish, and a reviewing court must assess "the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to the defen-dant's right to a fair trial." *Id.* at 572.

In support of his *Holbrook* claim, Hill relies primarily on the Elev-enth Circuit's decision in *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991). There, the petitioner had been convicted of murdering a prison guard in Florida. The crime had occurred in a tightly-knit community that was intimately tied to the prison, and, following the murder, over five-thousand people signed a petition supporting the execution of those who kill prison guards. *Id.* at 1457-58. Moreover, the murder and the resulting trial received vast publicity. Finally, and most importantly, approximately forty-five uniformed prison guards were present in the courtroom during significant portions of Woods's trial, for no apparent reason other than to view the proceedings. The Elev-enth Circuit concluded that, in those circumstances, the courtroom presence of the prison guards conveyed the unmistakable message that Woods was guilty and deserved the death penalty. The court thus ruled that "the pretrial publicity combined with the large number of

uniformed spectators rose to the level of inherent prejudice, thereby depriving the petitioner of a fair trial." *Id.* at 1460.

In Hill's case, however, the presence of law officers in the courtroom did not "brand" Hill "with an unmistakable mark of guilt." *Holbrook*, 475 U.S. at 571 (internal quotation marks omitted). We recognize, of course, that the community of Georgetown was greatly impacted by the horrible death of Major Guerry.[14] Likewise, that crime and Hill's subsequent trial were highly publicized. That said, however, there is nothing in the record to indicate that the courtroom was filled with an array of police officers. Further, the officers present were dispersed throughout the courtroom. In other words, they were not positioned so as to create the impression that Hill was dangerous. *See United States v. Elder*, 90 F.3d 1110, 1131 (6th Cir. 1996) (denying relief because marshals "were spread around the courtroom"). Finally, the jurors may well have believed that the officers seated in the courtroom were waiting to testify. The judge did not sequester the trial witnesses, and at least seventeen officers testified. In such circumstances, the presence of officers in the courtroom did not create a scene that "was so inherently prejudicial as to pose an unacceptable threat to [the] right to a fair trial." *Holbrook*, 475 U.S. at 572.[15] It necessarily follows that the state court's decision to deny the *Holbrook* claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law.

---

[14]The members of the Georgetown police force, as well as other law enforcement personnel in South Carolina, were also impacted by Guerry's tragic death. Such officers were entitled, absent a *Holbrook* problem, to be present at Hill's trial.

[15]Indeed, the facts underlying this claim are materially indistinguishable from those before the Court in *Holbrook*, where no due process violation was found. 475 U.S. at 472. In *Holbrook*, the defendants maintained that they had been denied a fair trial when four uniformed troopers sat behind the defendants in the first row of the courtroom's gallery. They contended that the troopers' presence was an unmistakable indication that they were guilty. *Id.* In rejecting their claim, the Court concluded that there was no evidence that the "four troopers tended to brand the [defendants] with an unmistakable mark of guilt." *Id.* (internal quotation marks omitted).

Our ruling on this issue, however, does not end the matter. Hill also contends that, if the current record does not entitle him to relief on the *Holbrook* claim, he is entitled to develop the record further. We thus turn to the Discovery claim, i.e., whether the district court abused its discretion in denying Hill an evidentiary hearing and in failing to authorize discovery on the *Holbrook* claim.

C.

In seeking habeas corpus relief on his *Holbrook* claim, Hill requested the district court to conduct an evidentiary hearing or authorize discovery so that he could obtain videotapes of his trial. The district court denied the Discovery claim, reasoning that the "introduction of the videotapes would not have aided any relevant evidence not already contained within the record." Order at 24. Hill now maintains that the district court abused its discretion in refusing to conduct an evidentiary hearing and failing to authorize discovery on his *Holbrook* claim. As explained below, the court was within its discretion in rejecting the Discovery claim, and we affirm.

To obtain authorization to conduct discovery, Hill is obliged to "make[ ] a specific allegation that shows reason to believe that [he] may be able to demonstrate that he is entitled to relief." *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998). Hill has failed to make the required showing, however, in that he has failed to provide any plausible indication that the videotapes he seeks might demonstrate that he is entitled to relief under *Holbrook*. In particular, there is nothing in the record indicating that these tapes may reveal a constitutionally inappropriate array of uniformed officers in the courtroom during his trial. Indeed, Hill acknowledges that it is unclear what the videotapes would establish. At best, he asserts that one of them might contain an image of the entire courtroom. This assertion is entirely speculative, however, in that there is no indication that the cameras taping the trial ever panned the courtroom.

Similarly, Hill has not made the showing required to obtain an evidentiary hearing. In order to secure an evidentiary hearing, Hill was obliged to allege "facts that, if true, *would* entitle him to relief." *See McCarver v. Lee*, 221 F.3d 583, 598 (4th Cir. 2000) (emphasis added). Just as he is unable to demonstrate that he is entitled to dis-

covery, Hill has failed to make the showing necessary to obtain an evidentiary hearing. In short, he has not pointed to any evidence that, if believed, would entitle him to relief. In other words, he has not alleged that such a hearing would resolve facts that, if true, would establish a due process violation. In these circumstances, the district court was within its discretion not to conduct an evidentiary hearing.

Absent a specific allegation providing reason to believe that either an evidentiary hearing or discovery proceedings may demonstrate that Hill is entitled to relief under *Holbrook*, we are unable to conclude that the district court abused its discretion in either denying Hill's request to conduct discovery or declining to award him an evidentiary hearing. *See Thomas v. Taylor*, 170 F.3d 466, 474-75 (4th Cir. 1999) (stating that petitioner was not entitled to discovery because he had failed to show that discovery would reveal that he was entitled to relief). We therefore affirm the district court on the Discovery claim.

## V.   The IAC claim

### A.

In his IAC claim, Hill maintains that his defense lawyers were ineffective in calling Dr. Edward Burt to testify during the trial's sentencing phase. At sentencing, Hill's lawyers sought to show that Hill suffered from a genetic condition that caused neurochemical imbalances in his brain. Specifically, they contended that Hill suffered from a genetically-based serotonin deficiency, which resulted in aggressive impulses. After his arrest and incarceration, Hill had been prescribed medication that they believed had successfully curbed these impulses. Thus, according to Hill's lawyers, the death penalty was not warranted because Hill's aggressive behavior was genetic (i.e., beyond his control) and treatable. To this end, Hill's lawyers presented the testimony of Dr. Emil Coccaro, who explained the role of serotonin in brain chemistry, as well as how genetics affects serotonin levels. Next, the defense called Dr. Bernard Albiniak, a forensic psychologist, who had performed a series of spinal taps on Hill to monitor his serotonin levels. Dr. Albiniak opined that Hill suffered from a chronic serotonin deficiency.

Finally, the defense called Hill's psychiatrist, Dr. Edward Burt. Dr. Burt was expected to testify that he had prescribed Prozac to treat

Hill's serotonin deficiency, and that Hill had responded favorably to the medication. Dr. Burt's testimony sought to establish that Hill's serotonin deficiency caused his aggressive behavior, and that a long history of violence and suicide in his family indicated that his aggressive impulses resulted from a genetic condition. Dr. Burt, however, apparently suffered a breakdown while on the witness stand. Thus, while testifying during the trial's sentencing phase, Dr. Burt had difficulty responding to questions, particularly on cross-examination.

Hill contended in the PCR Court that his defense lawyers should have known that Dr. Burt was incapable of testifying effectively. According to Hill, his lawyers also knew that, approximately eight months before trial, Dr. Burt had been arrested for public intoxication. Hill maintained that, in light of his lawyers' knowledge of Dr. Burt's problems, the decision to call him as a witness fell below an objective standard of reasonableness. Further, the decision to present Dr. Burt's evidence, Hill maintained, prejudiced his defense because it undermined the compelling evidence of Drs. Coccaro and Albiniak.

The state court summarily rejected Hill's IAC claim. It concluded that, although Dr. Burt "was not as effective as [Hill] would have liked," Hill's lawyers were not constitutionally ineffective in calling him as a witness because they had properly investigated him and prepared him for trial. PCR Order at 8-9. The district court also denied relief on the IAC claim, concluding that the state court's rulings were neither "contrary to" nor an "unreasonable application of" clearly established federal law. Order at 41-42. Hill now challenges the district court's ruling. Although we have issued a COA on this claim, we decline to award Hill any relief.

B.

After full consideration, we agree with the district court that the state court's resolution of the IAC claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law. Our analysis is guided by the principles of *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. In *Strickland*, the Supreme Court explained that, to be successful, an ineffective assistance claim must demonstrate: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Id.* at 687. The

performance of trial counsel is only "deficient" from a constitutional standpoint if the "representation [falls] below an objective standard of reasonableness." *Id.* at 688. Furthermore, the deficient performance of a defense lawyer will only result in prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In this instance, the state court appropriately concluded that the performance of Hill's lawyers was not constitutionally deficient. The record shows that, at trial, Dr. Burt appeared competent and able to testify. In fact, Hill's lawyers had "prepped" him for an hour immediately prior to his testimony. Although they knew of Dr. Burt's recent arrest, they believed him to be capable of testifying effectively. As the magistrate judge concluded, Dr. Burt's performance on the stand was "unforeseen and unforeseeable." Magistrate Report at 90. Because Hill's lawyers could not reasonably have foreseen that Dr. Burt would suffer a breakdown on the stand, they were not ineffective in presenting him as a witness. *See Strickland*, 486 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").[16] Thus, the state court's resolution of this claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law.

## VI.

Upon full consideration, we reject each of the four claims on which we issued a COA, and we affirm the judgment of the district court.

*AFFIRMED*

---

[16]In fact, as the magistrate judge noted, trial counsel may well have been ineffective had they failed to call Dr. Burt. Magistrate Report at 90; *see also Anderson v. Butler*, 858 F.2d 16, 18-19 (1st Cir. 1988) (stating that failure to call expert amounted to ineffective assistance).