James W. WILSON, Petitioner–Appellee,

v.

Jon E. OZMINT, Director, South Carolina Department of Corrections; Henry Dargan Mcmaster, Attorney General, State of South Carolina, Respondents–Appellants.

No. 03–3.

United States Court of Appeals, Fourth Circuit.

Argued: Sept. 25, 2003.

Decided: Dec. 17, 2003.

Modified by order filed Feb. 17, 2004, 357 F.3d 461.

**ARGUED:** Donald John Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellants. Sheri Lynn Johnson, CORNELL LAW SCHOOL, Ithaca, New York, for Appellee. **ON BRIEF:** Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Columbia, South Carolina, for Appellants. John H. Blume, BLUME & WEYBLE, Columbia, South Carolina, for Appellee.

Before WILKINS, Chief Judge, and WIDENER and LUTTIG, Circuit Judges.

Vacated and remanded by published opinion. Judge LUTTIG wrote the opinion, in which Chief Judge WILKINS and Judge WIDENER joined.

## OPINION

LUTTIG, Circuit Judge:

The State of South Carolina appeals from the district court's order granting to capital defendant James W. ("Jamie") Wilson a writ of habeas corpus under 28

U.S.C. § 2254. Because, as Wilson's counsel candidly conceded at argument, the district court did not review the state court proceedings and judgments under the standards governing federal habeas review, *see* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Bell v. Jarvis*, 236 F.3d 149 (4th Cir.2000) (*en banc*), and because Wilson is not entitled to relief under the applicable standards governing federal habeas review of state court judgments, we vacate the district court's grant of the writ and remand with instructions that Wilson's habeas corpus petition be dismissed.

## I.

The heinous acts which gave rise to Wilson's incarceration were described by the South Carolina Supreme Court as follows:

> On the morning of September 26, 1988, Jamie Wilson drove to his maternal grandmother's house and stole her .22 caliber, nine-shot revolver. Wilson then drove to an Abbeville discount store and purchased some .22 hollow-point long rifle ammunition. Wilson discarded the bullets already loaded in the gun, and reloaded the weapon with the more destructive hollow-point bullets. Wilson next proceeded to the Oakland Elementary School in Greenwood, where he parked his 1974 Maverick. He entered the school, finding his way to the cafeteria, where he stood quietly for a moment. It was right at lunch time for many of the children. Next, Wilson pulled out the pistol and began shooting, picking his victims, both children and adults, at random. Witnesses observed a look of hatred and rage masking Wilson's face.

Wilson fired until his gun was empty. He then went into a restroom and reloaded the weapon, after which he entered a classroom and opened fire again. After emptying his gun a second time, Wilson threw the gun down and stepped outside through a window. A teacher spotted him and told him to remain still with his hands up, which Wilson did. The police then arrived and took Wilson into custody.

The terror created and damage inflicted by Wilson on September 26 was considerable, and an entire nation was shocked, as the unthinkable had occurred. One female first grade teacher was shot once in the shoulder and once in the left hand, with the bullet traveling through her hand and into her throat. A young boy slumped forward onto a cafeteria table after Wilson aimed his pistol at the boy's temple and fired, hitting the boy in the head. Two little girls, both age eight, were shot dead. Children screamed; children fled; children hid under their desks; other children were shot.

*State v. Wilson*, 306 S.C. 498, 413 S.E.2d 19, 20–21 (1992).

Wilson was indicted on two counts of murder, nine counts of assault and battery with intent to kill, and one count of illegally carrying a firearm. *Id.* at 21. Before then-state Circuit Judge James E. Moore,[1] Wilson attempted to plead "guilty but mentally ill" (GBMI) to substantially all the charges brought against him. *Id.* To enter such a plea, Wilson was required by statute to show that, "because of mental disease or defect [he] lacked sufficient capacity to conform his conduct to the requirements of the law." S.C.Code 17–24–20(A).[2] The state trial court held a three-

---

1. Judge Moore now sits on the South Carolina Supreme Court.

2. S.C.Code § 17–24–20(A) provides that,
   [a] defendant is guilty but mentally ill if, at the time of the commission of the act consti-

day hearing, during which it heard twenty-four witnesses, to determine whether Wilson satisfied this standard. J.A. 969–1520. At this hearing and throughout the proceedings before the state trial court, Wilson was represented by attorneys William Nicholson and David Belser. At the hearing's conclusion, the trial court held, over the opposition of the state, that Wilson's mental state at the time of commission of the crime met the statutory standard for "guilty but mentally ill" and, accordingly, allowed Wilson to enter his plea. J.A. 1519.

The trial court thereafter gave Wilson's counsel the option of taking a twenty-four hour break, as allowed by statute, before beginning sentencing proceedings. J.A. 1521–22. After learning that the state did not intend to present any additional evidence of aggravating circumstances, Wilson's counsel declined to take the full twenty-four hours and requested that the court proceed with the sentencing proceedings later that afternoon. J.A. 1523–24. At sentencing, the parties agreed to incorporate into the record to prove statutory aggravating and mitigating factors, "all of the evidence, testimony, that had been presented in the hearing for the court to determine whether it accept[ed], or reject[ed], [Wilson's] plea." J.A. 1525. And, in fact, neither the state nor the defense presented any additional evidence during sentencing. J.A. 1527.

On May 9, 1989, based on all the evidence that had been presented to it, the trial court sentenced Wilson to death. J.A. 1558. Wilson appealed his sentence to the South Carolina Supreme Court, challenging both the availability of the death penalty for an individual pleading "guilty but mentally ill" under S.C.Code § 17–24–20(A), and the constitutionality of the death penalty when applied to such a person. The court rejected both of Wilson's challenges. *See Wilson,* 413 S.E.2d at 22, 27. Wilson next filed an application for post-conviction relief in South Carolina state court, raising many of the same claims brought before the district court and at issue in this appeal. The post-conviction relief ("PCR") court rejected each of Wilson's claims in a painstaking eighty-eight page opinion.

On June 13, 2002, having been denied relief by the South Carolina state courts, Wilson filed a petition for habeas corpus in federal district court pursuant to 28 U.S.C. § 2254. The magistrate judge's report on Wilson's petition again rejected all of Wilson's claims, finding that Wilson had failed to make a showing that would satisfy the standards of review set forth in section 2254(d). Declining to accept this recommendation, the district court subsequently reversed the findings of the South Carolina state courts and granted Wilson's petition for a writ of habeas corpus on the basis of its finding of eight constitutional errors in Wilson's guilty plea proceedings and sentencing hearing.

The State of South Carolina now appeals from the district court's order granting the writ. Wilson also appeals, claiming that the district court erred by not granting the writ on the additional ground that the imposition of the death sentence upon one who is unable to conform his conduct to the requirements of law, violates the Eighth and Fourteenth Amendments.

## II.

■ In granting the writ of habeas corpus to Wilson, the district court did not

---

tuting the offense, he had the capacity to distinguish right from wrong or to recognize his act as being wrong as defined in section 17–24–10(A), but because of mental disease or defect he lacked sufficient capacity to conform his conduct to the requirements of the law.

review, nor even purport to review, the judgments of the South Carolina state courts under the standards governing federal court review of state court judgments set forth in 28 U.S.C. §§ 2254(d) & (e)(1). As even counsel for the petitioner admitted before this court (though arguing for affirmance on different grounds), this failure to apply the governing standards constitutes clear error under the precedent of both the Supreme Court of the United States and this Circuit. *See Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Bell v. Jarvis,* 236 F.3d 149 (4th Cir.2000) (*en banc* ).

Section 2254(d) provides that, "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court *shall not* be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim," in state court satisfies the conditions set forth in section 2254(d)(1) or (d)(2). 28 U.S.C. § 2254(d) (emphasis added). Thus, by granting the writ without determining whether the state court's adjudication of Wilson's claim satisfied either sections 2254(d)(1) or (d)(2), the district court failed even to conduct the analysis that is a precondition to grant of the writ of habeas corpus. For this reason, the district court's opinion is of little, if any, relevance to the proper disposition of Wilson's petition.

■ Before a federal court may grant a writ of habeas corpus to a petitioner in state custody, that court must conclude either that the state court decision denying his claim was "contrary to, or involved an unreasonable application of, clearly established federal law," section 2254(d)(1), or that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented" before the state court, section 2254(d)(2). The state court's decision is "contrary to

... clearly established federal law," under § 2254(d)(1), where it "applies a rule that contradicts the governing law set forth" by the Supreme Court of the United States or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a different result." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. In contrast, a state court's decision "involves an unreasonable application of[ ] clearly established federal law," section 2254(d)(1), "if the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of a particular state prisoner's case." *Id.* at 407, 120 S.Ct. 1495. In assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not "whether [its decision] [was] well reasoned." *See Bell,* 236 F.3d at 159; *Wright v. Angelone,* 151 F.3d 151, 157 (4th Cir.1998); *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997).

■ Of course, even if the writ of habeas corpus is authorized under section 2254(d), a petitioner still must show, in order to be entitled to relief, that any constitutional errors committed "had substantial and injurious effect or influence on the verdict" rendered by the jury. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Fullwood v. Lee,* 290 F.3d 663, 679 (4th Cir.2002) (applying *Brecht* after enactment of AEDPA).

### III.

Turning first to the state's contentions on appeal, the state argues that the district court erred in finding that Wilson's guilty plea was not "knowing, voluntary and intelligent." Because the state court's finding that Wilson's plea was knowing, voluntary and intelligent was not "objec-

tively unreasonable," *Williams*, 529 U.S. at 407, 120 S.Ct. 1495, we agree that the district court erred in granting the writ on this ground.

The Supreme Court has held that "waivers of constitutional rights," such as the right to a trial through a guilty plea, "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). The state PCR court rejected Wilson's claim that his guilty plea was not "knowing, voluntary or intelligent," based on its finding that "the record ... reveals that the plea of guilty but mentally ill was entered with an understanding by [Wilson] and his counsel of the full consequences that he was facing at the time the plea was entered." J.A. 618.

■ Not only was this conclusion not "objectively unreasonable," it was quite ob-

viously correct. The state trial court repeatedly informed Wilson of both the procedural and substantive consequences of his guilty plea. During its colloquy with Wilson, the court informed him that the death penalty was a possibility no less than five times. Each time, Wilson answered that he understood.[3] The record further discloses that Wilson was aware that the state trial court, not a jury, would make the decision as to whether to sentence Wilson to death, and that the decision would be made by weighing aggravating and mitigating evidence presented during the case. *See* J.A. 936–37.[4]

■ Wilson argues that the plea colloquy was nevertheless ineffective in his case because it was unclear at the time of his plea whether the death penalty was available for someone who was "guilty but mentally ill." The state PCR court was correct to reject this argument. Both of Wilson's attorneys testified before the

---

**3.** The following is taken from Wilson's colloquy with the state trial court prior to the entry of his plea:

Court: Do you understand that the punishment for one found guilty or pleading guilty to murder may be either life imprisonment or death by electrocution? Do you understand that those are the two punishments?
Wilson: Yes, sir.
Court: Do you understand what the court means when it says death by electrocution?
Wilson: Yes, sir.
J.A. 926.
Court: If the court, after that hearing, accepts that plea of guilty but mentally ill, do you understand, sir, that there would [be] an additional hearing where this court, again without a jury, would listen to any evidence that may be presented by either side. The court would consider that evidence, and this court would decide what that punishment would be on these indictments, in the case of murder either life imprisonment, or death by electrocution? Do you understand that?
Wilson: Yes, sir.
J.A. 930.
Court: Do you understand, then, that if you plead guilty but mentally ill and the court

accepts that plea that you would give up, or waive, that right of a jury to make that decision as to whether you were to receive life imprisonment or death?
Wilson: Yes, sir.
J.A. 936.
Court: I've explained to you that the sentence in the case of murder could be either life imprisonment, or death by electrocution. Do you understand that?
Wilson: Yes, sir.
J.A. 937.

**4.** Again, the following is taken from Wilson's plea colloquy with the state trial court:

Court: Do you understand, too, Mr. Wilson, that if this court, after this hearing to determine if the court will accept, or reject, the plea of guilty but mentally ill, do you understand, sir, that if the court accepts that plea that the section of the code, 17–24–70, provides that the trial judge would sentence you as provided by law for a defendant who is found guilty? Do you understand that?
Wilson: Yes, sir.
J.A. 936–37.

state PCR court that, in retrospect and at the time of Wilson's sentencing, they understood that the state trial court could sentence Wilson to death.[5] Nicholson even testified at the state PCR hearing that he personally discussed with Wilson the fact that, if Wilson were to plead guilty but mentally ill, the decision of whether to sentence Wilson to life in prison or death would be made by a judge, not a jury. J.A. 2870. Thus, it is clear that both Wilson and his counsel were well aware of the possibility that, if his plea of guilty but mentally ill was accepted, Wilson could be sentenced to death.

We therefore conclude that the state PCR court's conclusion that Wilson's plea of "guilty but mentally ill" was "knowing, voluntary and intelligent" was not "objectively unreasonable." *See Williams,* 529 U.S. at 409, 120 S.Ct. 1495. Accordingly, the district court also erred in granting a writ of habeas corpus on this ground.

## IV.

The state next challenges the district court's finding that David Belser, co-counsel for Wilson, was ineffective for his failure to inform Wilson, before he entered his guilty plea, that Dr. Donald Morgan, a psychiatrist who had already testified on Wilson's behalf in the guilty plea hearing, had come to believe that Wilson was legally insane on the date of the shooting. Conducting the review of the state PCR court decision required under sections 2254(d) and (e)(1), we agree with the state and hold that neither the state PCR

court's rejection of this ineffective assistance of counsel claim nor the factual findings on which that rejection was based were unreasonable.

Dr. Donald Morgan testified for the defense at Wilson's guilty plea hearing that, in his opinion, Wilson met the legal standard for being "guilty but mentally ill," at the time of the shootings, but not the *M'Naghten* standard for legal insanity.[6] Morgan was the first witness to testify at the hearing and remained in the courtroom for the balance of the testimony. Wilson argued before the state PCR court, and reasserts here, that, while listening to the remainder of witness testimony, Dr. Morgan became convinced that Wilson was not only mentally ill at the time of the shootings, but actually insane. Wilson further asserts that, at some time before the conclusion of the guilty plea hearing, Morgan informed David Belser, Wilson's counsel, about his change in opinion but that Belser neither informed Wilson of this fact nor put Morgan on the stand to testify as to his change in opinion. Belser's failure to take either action, Wilson argues, constitutes ineffective assistance of counsel.

The state PCR court rejected Wilson's claim, based on a factual determination that Dr. Morgan did not in fact have a change of opinion during the guilty plea hearing and that, even if he did, he never informed Belser that he had changed his professional medical opinion. In support of this factual determination, the state PCR court found there to be no evidence that Morgan informed anyone of any

---

5. David Belser, co-counsel for Wilson, testified at the state PCR hearing that he believed that the entry of a "guilty but mentally ill" sentence meant that "Wilson would not get the death penalty or *if he did,* it would never be upheld." J.A. 2784 (emphasis added). Similarly, William Nicholson, Wilson's other counsel, testified that a plea of guilty but mentally ill "would have some power on appeal and *if he did receive the death penalty, we*

had a belief that he could not receive the death penalty." J.A. 2882 (emphasis added).

6. As codified by the state of South Carolina, the *M'Naghten* standard asks whether the defendant, "lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong." S.C.Code § 17–24–10(A).

change in his opinion, either at the time of the guilty plea hearing or immediately afterwards. It also found that Morgan was unable to offer a convincing explanation for a sudden change of opinion. Finally, it found that Morgan's testimony at the PCR hearing was tainted due to his personal opposition to Wilson's sentence of death, animus towards Dr. Dietz, the state's expert witness, and subsequent involvement with Wilson's defense team during the post-conviction proceedings. The state PCR court also held that, even if Morgan did inform Belser of a change in his opinion, Belser's failure to take action on this information was not ineffective assistance of counsel because Wilson failed in his burden to show that he was prejudiced by any inaction by Belser.

■ The heart of Wilson's claim for habeas relief on this issue is that the state PCR court's decision relied upon factual determinations that were "objectively unreasonable," under section 2254(d)(2), and that are rebutted by "clear and convincing evidence," under section 2254(e)(1).[7]

■ Credibility determinations, such as those the state PCR court made regarding Morgan, are factual determinations.

As such, they "are presumed to be correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (internal citations omitted). Applying these standards, we hold that Wilson has failed in his burden to show, under section 2254(d)(2), that the state PCR court's rejection of this ineffective assistance of counsel claim was based on "objectively unreasonable" factual determinations.

■ As a preliminary matter, Wilson has failed to rebut by "clear and convincing evidence" any of the facts relied upon by the state PCR court in determining that Wilson's testimony was not credible. *See* 28 U.S.C. § 2254(e)(1). Wilson argues that the testimony of Belser "flatly contradicts" the PCR court's factual finding that Dr. Morgan did not tell anyone of his change of opinion during the guilty plea hearing. Petitioner's Br. at 26. But this is not so. Belser testified only that he remembered Morgan "wanting to discuss

---

**7.** Wilson also contends that the state PCR court's holding as to Dr. Morgan was "contrary to" the Supreme Court's decision in *Hill v. Lockhart* in two respects. Both are meritless.

First, he argues that the state PCR court erred in its reliance on our holding in *Savino v. Murray,* 82 F.3d 593, 599 (4th Cir.1996), to require that, in order for Wilson to prevail on this ineffective assistance of counsel claim, there be a reasonable possibility that the insanity defense would have succeeded at trial. *See* J.A. 642–43. This was not "contrary to . . . clearly established Federal law." § 2254(d)(1). *Savino* accurately stated the Supreme Court's holding in *Hill,* and the state PCR court was correct to rely on it. *See Hill,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (holding that a petitioner must show prejudice to prevail in an ineffec-

tive assistance of counsel claim and, "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial").

Second, Wilson contends that the state PCR court's decision was "contrary to" Supreme Court precedent because it required that "Jamie himself personally testify that had he been informed of the insanity defense, he would have opted to go to trial rather than plead guilty." A review of the opinion of the state PCR court opinion reveals, however, that it required no such thing. Rather, the state PCR court considered the fact that Wilson did not testify to be one factor, among many, that supported its conclusion that Wilson failed to show that he would have changed his plea if informed of Morgan's changed opinion. J.A. 644.

with me further issues about criminal responsibility," not that Morgan informed him that he had changed his opinion. J.A. 2722. And as to this, Belser testified only that "I don't remember specifically what [Morgan] told me." J.A. 2722. Belser's testimony at the state PCR hearing, thus, does not prove, contrary to Wilson's contention, that Morgan told Belser that he had come to believe that Wilson was insane.[8]

■ Accepting then the factual findings that the state PCR court relied upon to support its determination that Morgan's testimony at the PCR hearing was not credible, we also find the credibility determination on which the state PCR court's decision was based not to be "objectively unreasonable." At and before the plea hearing, Dr. Morgan—and every other doctor to offer an opinion on Wilson's mental state—had opined that Wilson did not meet the legal standard for insanity. J.A. 637–38. Notwithstanding the significance of his alleged change in opinion, Morgan never told his fellow witness and colleague at the William S. Hall Institute, Dr. Geoffrey McKee, that he had changed his opinion. Even when Morgan discussed the case with McKee in 1990, he did not mention that, despite his testimony at the guilty plea hearing, he had come to believe that Wilson was legally insane at the time of the murders. J.A. 641.

Moreover, Dr. Morgan never offered a satisfactory explanation for his change of opinion during the guilty plea hearing. Morgan was fully aware of the content of the eye-witness testimony when he testified at the guilty plea hearing that, in his opinion, Wilson was not insane; in fact, Morgan himself "reviewed and considered [the eye-witnesses'] earlier statements" *during* his testimony at the guilty plea hearing. J.A. 640–41. Additionally, to the extent that the witnesses' testimony on the stand differed from their written testimony, to which Morgan had access, the state PCR court found that "the witnesses' testimony clarified their earlier statements" in ways that made it less, not more, likely that Wilson was insane at the time he acted. J.A. 643 (finding that witnesses' testimony tended to demonstrate that Wilson's shooting at the school was not random and that Wilson attempted to blame someone else when first confronted with the murder). In fact, the only unchallenged reason that Morgan offered to the state PCR court for his change of opinion was that "hearing," as opposed to reading, the testimony of the live witnesses to Wilson's shooting caused him to reassess the significance of certain testimony.

Finally, Dr. Morgan's sympathies were with Wilson at the state PCR hearing and these sympathies may have influenced his testimony.[9] Morgan continued his involve-

---

**8.** Wilson also claims that the state PCR court erred in its factual finding that, "at the time the plea was entered, *even under Wilson's current factual scenario,* no one had opined that Wilson lacked the capacity or ability to differentiate right from wrong at the time of the alleged offense." *See* J.A. 645. This finding is, of course, correct technically. Under Wilson's factual scenario, however, Dr. Morgan had informed Belser that he wished to be put back on the stand, "to tell Judge Moore that he had changed his mind." J.A. 2304. Still, it is clear that the state PCR court's decision was not "based on" any error that inheres in this finding. *See* § 2254(d)(2) (stat-

ing that the state court's decision must be "based on an unreasonable determination of the facts"). In fact, the state PCR court acknowledged that Dr. Morgan testified that he informed Belser of his change of opinion at other points in its opinion. J.A. 639.

**9.** Wilson vigorously argues that the state PCR court erroneously based its credibility determination on the fact that Morgan disliked Dr. Dietz, the state's psychiatric expert. Because we find the state PCR court's credibility determination to be otherwise amply supported, we need not enter this factual thicket.

ment with Wilson after the guilty plea hearing, working to assist his post-conviction defense team. J.A. 640. And Morgan's personal opinion at the time of the guilty plea hearing *and* at the time of the state PCR court hearing was that Wilson should not be executed. J.A. 641.

These facts do not compel the credibility determination reached by the state court, but they certainly provide sufficient basis, for purposes of section 2254(d)(2), to support such a determination. We find that the state PCR court's dismissal of Wilson's ineffective assistance of counsel claims relating to Dr. Morgan was not based on factual determinations that were "objectively unreasonable." Therefore, we agree with the state PCR court's judgment that Belser was not deficient for failure to respond to Morgan's changed opinion, for the simple reason that Belser was never told that Morgan changed his mind.

## V.

The state next argues that the district court erred in its grant of the writ on Wilson's claim that he received ineffective assistance due to his counsel's failure (1) to develop and present additional mitigating evidence at sentencing, and (2) to investigate fully Wilson's background by hiring a social worker to prepare a family and social history. The district court found that counsel's failure to develop such evidence fell "below the standard of reasonable competence," and deprived Wilson "of a fair trial." J.A. 537. In reaching this conclusion, however, the district court again reviewed the decision of the state PCR court *de novo*, rather than under the standards set forth in AEDPA. Applying, as we must, the standards of review required by AEDPA, we find that the state PCR court's rejection of Wilson's ineffective assistance of counsel claim was not "objectively unreasonable" and, therefore, vacate the order of the district court granting the writ on these grounds.

■ Because the state PCR court correctly identified the governing legal standard as that set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we limit our review to the question of whether that court's application of the *Strickland* standard was "objectively unreasonable." *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

■ *Strickland* requires that a petitioner show that his counsel's performance was deficient, and that the deficiency prejudiced his defense, in order to establish ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The simple standard for assessing counsel's competence is whether his "assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Due to the high level of deference accorded to the judgments of counsel when those judgments are based on a "thorough investigation of the law and the facts," *see Strickland*, 466 U.S. at 690, 104 S.Ct. 2052 (explaining that such judgments are "virtually unchallengeable"), a court conducting the "reasonableness" inquiry under *Strickland* in the context of a counsel's decision not to present mitigating evidence is not concerned so much with the question of "whether counsel should have presented a mitigation case" but, rather, "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Wiggins*, —— U.S. at ——, 123 S.Ct. at 2536 (emphasis in original). The level of deference to be accorded counsel's judgment in this regard depends on "the adequacy of the investigations supporting those judgments." *Wiggins*, —— U.S. at ——, 123 S.Ct. at 2535. As the Court in *Strickland* explained:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchal-

lengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. This determination of reasonableness requires a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Id.* at 688, 104 S.Ct. 2052.

## A.

Turning first to Belser and Nicholson's decisions not to present mitigation evidence beyond that presented at the guilty plea hearing, we must decide whether the state PCR court's conclusion that these decisions were not "outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, was "objectively unreasonable," *see* § 2254(d)(1); *Williams*, 529 U.S. at 409, 120 S.Ct. 1495. Based on the thorough investigation undertaken by Belser and Nicholson and the large amount of evi-

dence that had already been presented in mitigation through the guilty plea hearing, we find that it was not.

### i.

We evaluate first the district court's finding that it was unreasonable under *Strickland* for Wilson's counsel not to present, at sentencing, the additional testimony of six witnesses regarding his troubled upbringing and social difficulties.[10] As stated above, when conducting *Strickland*'s reasonableness inquiry, "our principal concern is ... whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background *was itself reasonable.*" *See Wiggins,* —— U.S. at ——, 123 S.Ct. at 2536 (emphasis in original). Here, we conclude that counsel conducted an extensive investigation into both Wilson's family and social life. We also find that counsel based their decision not to present additional evidence beyond that introduced at the guilty plea hearing on the knowledge gained from this investigation.

In his challenge to the state PCR court's decisions, Wilson initially claims that counsel's decision not to present this additional information was the result of mere neglect, rather than a strategic decision based on the previous investigations of counsel. For this reason, Wilson argues, his counsel's decision not to present evidence is entitled to no deference under

---

**10.** The six witnesses that Wilson claims his counsel should have presented are his father James T. Wilson, his sister Lynn Littleton, his driving teacher Emmett Hutto, his reverend James M. Blackwell, and doctors Charles Baber and Geoffrey McKee. Wilson argues that his father would have testified that he beat Wilson regularly to discipline him and chased him around the house with a gun on occasion, testimony that Littleton, Wilson's sister, would have corroborated. Littleton would have also testified that her parents "did not want" Wilson and sent him off to live with his

grandparents, and that her father behaved inappropriately towards she and her sister. Wilson further contends that Hutto, Wilson's driving teacher, and Blackwell, Wilson's pastor, would have testified that Wilson stood out as unusual among his peers for his "trance-like" or "zombie-type" appearance. Finally, Wilson argues that Doctors Baber and McKee, both of whom testified at Wilson's guilty plea hearing, would have presented further mitigating evidence concerning Wilson's dysfunctional family life.

*Strickland.* The record simply does not support Wilson in this regard. At the state PCR hearing, Nicholson testified that the defense team's decision not to present additional mitigation evidence was based on its determination "that the mental illness evidence was our best evidence in mitigation," a determination whose merit was confirmed by the state trial court's acceptance of Wilson's plea of "guilty but mentally ill." J.A. 2877. He also testified that "the judge had enough to decide [whether to sentence Wilson to death], and we felt confident that he would decide that he shouldn't receive the death penalty." *Id.* Nicholson stated further that he did not present additional evidence of Wilson's background because he judged it to be "typical evidence," not likely to influence the trial court's decision. *Id.* From this testimony, it is clear that the defense team's decision not to present additional witnesses was strategic, not the product of neglect. Put simply, Wilson's counsel believed that their best mitigation evidence had been presented during the guilty plea hearing, and that the additional evidence would only have detracted from the power of the mitigation evidence that they had already presented.[11]

▮ Turning then to the reasonableness of the investigation supporting this strategic judgment, we find that Belser and Nicholson conducted a substantial investigation into Wilson's life history, and were well aware of the content of the testimony that would have been presented through the six witnesses that Wilson contends should have been offered. In fact, at the time that they made the decision not to present additional evidence, Belser and Nicholson had interviewed each of the six witnesses that Wilson now relies upon, both for the purpose of learning about Wilson's family and social life and to prepare them for possible testimony. J.A. 2749–50, 2786–87 (Belser); 2850–54 (Nicholson). From these interviews, they were well aware of the kind of testimony that these six witnesses would have provided. In addition, Belser and Nicholson had discussed Wilson's family and social background in the context of Wilson's mental health with at least five different medical experts, *see, e.g.,* J.A. 2872–73, including Dr. Geoffrey McKee, who had himself interviewed Wilson's family members, J.A. 1100. As *Strickland* makes clear, when counsel makes a strategic choice after such a "thorough investigation of law and facts relevant to plausible options," that choice is "virtually unchallengeable." *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

The reasonableness of the strategic decision made by Wilson's counsel is also supported by the fact that a substantial amount of the evidence that Wilson alleges would have been introduced through the testimony of additional witnesses had already been introduced through the testimony of Drs. Morgan, McKee, Baber and Folingstad during the guilty plea hear-

---

11. The state PCR court speculated that Wilson's counsel could have decided against calling Wilson's father and sister in order to avoid the admission of additional damaging testimony as to "Wilson's violence and disrespect toward his parents, grandparents, or other authority figures," J.A. 612, although this was not the reason given under oath by counsel for their decision. Even had this been a reason or the sole reason for counsel's decision, the decision still would have been reasonable, as a strategy to avoid, not only repetition, but repetition in greater detail of testimony as to Wilson's prior violent acts. We decline to be drawn into speculation as to whether the reason posited by the state PCR court also underlay (or underlay alone) counsels' decision not to call the Wilson family witnesses. We have no basis upon which to question Nicholson's sworn testimony as to the reasons why the defense did not call Wilson's father and sister, and the reasonableness of the decision not to elicit their testimony is amply supported by the reasons given by him under oath.

ing,[12] testimony that itself was, at least in part, the product of interviews conducted with Wilson's family members. Cumulatively, these doctors testified that Wilson's father had abused him severely, beating him at various points with a belt, a can, and a shoe and, on occasion, threatening him with a gun. They also testified that Wilson's only social interaction outside his family involved a homosexual relationship that he had with a 42 year old man, in which Wilson traded sex for drugs. J.A. 1071. It was reasonable for Belser and Nicholson to conclude that the additional testimony of Wilson's father and sister to supplement these reports of violence and sexual abuse would not have affected the decision of the sentencing court.

Reviewing the decision that Belser and Nicholson made not to present additional witnesses, as we must, in light of their substantial investigation into Wilson's family and social life and the large amount of evidence that they had already introduced at the guilty plea hearing, we conclude that the state PCR court did not unreasonably conclude that their conduct fell well within the "wide range of professionally

competent assistance," *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Thus, to the extent that the district court's grant of the writ of habeas corpus was based on the failure of Wilson's counsel to present additional mitigating evidence in the form of these six witnesses, the district court was in error.

### ii.

We turn next to Wilson's claim that his counsel was constitutionally deficient for failing to present mitigation evidence that the medication that he was taking caused him to have a "stony-faced" appearance. Wilson asserts that this evidence was critical because it would have rebutted the impression given by his appearance that he did not feel remorse for his actions. The state PCR court rejected this claim, finding that the decision of Wilson's counsel not to present additional testimony to explain the effects of Wilson's medication was not an oversight, but rather a strategic decision, based on the fact that the defense had already put on evidence that Wilson's "stony-faced" appearance was evidence of his mental illness.

---

**12.** Dr. Donald Morgan testified that Wilson's father physically abused him as a child, often cursing him, throwing things at him and beating him with a belt. J.A. 1068–69. Morgan further testified that Wilson's father threatened him with a gun. J.A. 1069. Dr. Geoffrey McKee reported evidence gained from extensive interviews with Wilson's mother and grandmother that Wilson had shown obsessive compulsive symptoms since he was 8 or 9. These included washing his hands compulsively, not allowing any of his sisters to touch the refrigerator door, refusing to drink out of anything but a Dixie cup, and only opening doors with a handkerchief. J.A. 1128–29. His grandmother, with whom Wilson lived immediately before his crime, also told Dr. McKee that Wilson had a fascination with the dark and refused to allow the dining room lights to be turned on or the drapes opened at any time, *id.*, and that Wilson had suffered the death of his grandfather and the

murder of a neighbor in recent years. J.A. 1131. Dr. Charles Baber similarly testified at the guilty plea hearing that Wilson came from a history of abuse in the home, that his father had on occasion threatened to kill him, had hit him in the head with a can, and that Wilson was singled out and picked on at school. J.A. 1208–10. Dr. Baber also testified that he believed these pathologies in the home were the "basic cause" of Wilson's mental problems as an adolescent.

Additionally, Dr. Diane Folingstad testified that Wilson suffered borderline personality disorder and schizotypal personality disorder. She testified that Wilson's grandmother had described Wilson as getting worse over time, talking to himself and others who were not actually there, and becoming increasingly paranoid about other people being out to get him. Folingstad also reported that Wilson made "threats to his parents, [and] threats to his grandparents." J.A. 1483.

J.A. 614; *see also* J.A. 1487 (testimony of Dr. Diane Folingstad). Again, we agree with this conclusion. It was entirely reasonable for the state PCR court to find that Wilson's counsel was not deficient in deciding to cast Wilson's appearance as the product of his mental illness, rather than his medication. This choice was more consistent with the defense team's overall strategy in mitigation, that Wilson should not be executed because he was mentally ill.

## B.

■ The district court also held that Wilson received ineffective assistance of counsel because Belser and Nicholson did not hire a social service worker to conduct an extended family history investigation. Wilson alleges that the failure of his counsel in this regard "bears a striking resemblance to *Wiggins v. Smith*," in which the Supreme Court recently held that counsel was deficient under *Strickland* for failing to hire a social service worker to conduct an investigation into the petitioner's background. *See generally, Wiggins v. Smith*, —— U.S. ——, 123 S.Ct. 2527, 156 L.Ed.2d 471 (June 26, 2003). Reviewing Wilson's claim to determine whether the state PCR court's application of *Strickland* was "objectively unreasonable," *see Williams*, 529 U.S. at 409, 120 S.Ct. 1495, we find that the similarities between this case and *Wiggins* are more superficial than real and that the state PCR court's rejection of Wilson's ineffective assistance claim on this ground was not "objectively unreasonable."

In *Wiggins*, the Supreme Court held that the decision by Wiggins' counsel not to present mitigation evidence, and to instead "retry the facts," at the sentencing

stage, was a violation of *Strickland*'s governing legal principles and that it was "objectively unreasonable" for a Maryland state court to conclude otherwise. *Wiggins*, —— U.S. at ——, 123 S.Ct. at 2542. *Wiggins* was clear that the failure of Wiggins' counsel was not that they ultimately decided to limit their investigation or that they decided to focus on Wiggins' culpability in mitigation, *see id.*, but, rather, that the "investigation said to support" those decisions was itself unreasonable. *Id.* at 2538. Conducting an independent review of the evidence, the court found that the entire "life history" investigation of the counsel in *Wiggins* was limited to reviewing "a one-page account of Wiggins' 'personal history'" contained in a pre-sentencing report and to "tracking down" records from the Baltimore City Department of Social Services, which described Wiggins' placements in Maryland's foster care system. *Id.* at 2536. The court held that "the scope of counsel's investigation into [Wiggins'] background" was unreasonably narrow in light of prevailing professional standards and the particular evidence included in the social services report. *Id.* at 2539.

The decision of Wilson's counsel not to commission an additional investigative report stands in stark contrast to the decision made by Wiggins' counsel. Unlike in *Wiggins*, Wilson's counsel made the decision not to present additional mitigation evidence after a thorough investigation into Wilson's family life and social history. This investigation included interviews with Wilson's family members, teachers, and numerous medical specialists, at least one of which had himself interviewed individuals from Wilson's family and social background.[13] J.A. 1100 (testimony of Dr.

---

13. The full investigation of Wilson's counsel, Belser and Nicholson, was substantial. Wilson's counsel interviewed virtually every family member in Wilson's family, including Wilson's father and his sister, in order to "find out something about what Jamie was like in the years prior to the crime." J.A. 2749.

McKee). This thorough investigation provided Belser and Nicholson with the knowledge to make a "reasonable professional judgment" about whether it would be helpful to hire an additional researcher to look again at Wilson's immediate and extended family.[14] Indeed, it appears that the Supreme Court reached the same conclusion in similar circumstances,

> [C]ounsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment. It appears that he did interview all potential witnesses who had been called to his attention and that there was a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty. Having made this judgment, he reasonably determined that he need not undertake further investigation to locate witnesses who would make statements about Berger's past.

*See Burger v. Kemp*, 483 U.S. 776, 795, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1986).

Therefore, it was not "objectively unreasonable" for the state PCR court to con-

---

Belser explained that his purpose in conducting these interviews was that he "wanted to have some kind of social history that [he] could present to the sentencing body." *Id.* Second, Belser and Nicholson also testified at the state PCR hearing that they interviewed all of Wilson's school teachers that would speak with them, including Wilson's "driver's ed teacher," Emmett Hutto, about testifying at Wilson's hearing or sentencing phase. J.A. 2786–87 (Belser); J.A. 2853–54 (Nicholson). As with his interviews with Wilson's family members, Belser's purpose in interviewing Wilson's teachers was "[t]o describe chronologically the gradual deterioration in his functioning from his early childhood through adolescence and the difficulty that he had in school." J.A. 2787. Nicholson noted that the defense team attempted to interview more of Wilson's teachers, but had difficulty because many of the teachers were unwilling to talk to them. J.A. 2854. Third, Belser and Nicholson hired or interviewed at least five medical experts, Doctors Donald Morgan, Geoffrey McKee, Charles Baber, Harold Morgan and Diane Folingstad, each of whom was familiar with Wilson's mental condition *and* his family and social history. Dr. McKee even "interviewed Mr. Wilson's mother and father and maternal and paternal grandmothers" in the preparation of his report on Wilson. J.A. 1100.

Additionally, doctors McKee, Folingstad, Baber, and Donald Morgan each testified on Wilson's behalf at the guilty plea hearing, both that Wilson met the legal standard for a plea of "guilty but mentally ill," and that Wilson had been raised in a chaotic and abusive family environment.

**14.** The wisdom of this strategic judgment was borne out by the results of Patricia Feigley's investigation. This investigation, which Wilson's post-conviction team did commission, produced little new evidence related to Wilson's own life. Consistent with the evidence produced in the investigations conducted by Wilson's counsel, this subsequent investigation found that Wilson's father abused him, J.A. 2443, that his family life was chaotic, J.A. 2444–46, that he abused prescription drugs, J.A. 2460–61, and that he showed signs of mental illness and paranoia from a young age, J.A. 2470–74.

Feigley did discover evidence of substance abuse and mental illness in Wilson's extended family, which Belser and Nicholson's investigation into Wilson's life did not uncover. Feigley testified that, in her opinion, these findings tended to show "a genetic component" of mental illness in Wilson's family. J.A. 2462. Here too, however, counsel's judgment that they had conducted a sufficiently thorough investigation into Wilson's mental illness—and thus that further investigation by a social worker into the life histories of Wilson's extended family was unnecessary— proved to be reasonable. After reviewing the evidence that Wilson's counsel did present, the state trial judge *agreed* with Wilson's counsel and found as mitigating factors that, at the time of the murders, Wilson was "under the influence of mental, or emotional disturbance," and that he was "unable to conform his conduct to the requirements of the law." J.A. 1557–58.

clude that Belser and Nicholson's decision not to commission an additional report regarding Wilson's background and extended family was a reasonable limitation on the scope of their investigation. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

## VI.

The state next contends that the district court erred in granting the writ of habeas corpus to Wilson based on the state trial court's order quashing Wilson's subpoena of a report prepared by the Quality Care Review Board (QCRB) of the State Department of Mental Health (DMH). The state argues that Wilson's claims related to the QCRB report are barred by state procedural rules and that the state trial court was correct not to give Wilson access to the QCRB report.[15] Because we find that Wilson either failed to exhaust or abandoned this claim in state court, we agree.

The district court granted the writ without addressing the state's procedural claims; rather, proceeding directly to the merits, the district court found that the state trial judge erred, first, by refusing "to consider non-statutory mitigating evidence," in violation of Wilson's rights under the Eighth Amendment, as set forth in *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and, second, somewhat ironically, by considering such evidence in sentencing Wilson to death in violation of Wilson's right to due process under *Gardner v. Florida,* 430 U.S. 349, 360, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). J.A. 543. Again, the district court erred fundamentally. Not only did it fail to apply the standards of review set forth in section 2254(d) or, for that matter, review the decision of the state court at all, it also failed to address the state's primary contention, that Wilson

is barred from raising this claim in his federal habeas petition because he did not first allow the state courts an opportunity to review it.

The Quality Care Review Board conducted an investigation into the adequacy of Wilson's treatment in the state mental health system in South Carolina, following Wilson's shooting spree at Oakwood Elementary School. The investigation culminated in a report (the "QCRB report"), detailing Wilson's history in the state mental health system and tending to absolve the state of responsibility for Wilson's acts. Wilson subpoenaed the report from the Department of Mental Health in April 1989. The department moved to quash the subpoena and proposed that the state trial court review the report *in camera* to determine the relevancy of the documents. Wilson's counsel, Belser, told the court that he had no problems with this procedure. J.A. 585. After reviewing the report, the state trial court found that it was not relevant to Wilson's proceedings and quashed the subpoena.

In his appeal to the South Carolina Supreme Court, Wilson initially listed the trial court's denial of access to the report as Exception 4 in his appeal, but, after the court gave Wilson access to the report, he entered a motion for the court to "defer consideration" of the issue in order to allow counsel to "review the report with experts and to take additional testimony." J.A. 587. The South Carolina Supreme Court granted the motion, without explanation, on May 10, 1990, and, in its opinion addressing Wilson's remaining claims, it did not mention those related to the QCRB report. *See generally, State v. Wilson,* 306 S.C. 498, 413 S.E.2d 19 (1992).

---

**15.** Although Wilson claims that the state has abandoned this claim on appeal, Petitioner's Br. at 65 n. 23, the state clearly asserts in its brief that Wilson may not, under South Carolina procedural rules, raise this claim here. Appellant's Br. at 76.

■ Wilson next attempted to raise his claims related to the QCRB report before the state PCR court. The state PCR court rejected both claims on procedural and substantive grounds. Most importantly for our purposes, it found that neither of Wilson's claims could be raised before a post-conviction relief court, because, under South Carolina law, claims that could have been raised before a trial court or on direct appeal may not be raised in post-conviction relief proceedings. J.A. 586; *see Drayton v. Evatt,* 312 S.C. 4, 430 S.E.2d 517, 519 (1993) ("[E]rrors which can be reviewed on direct appeal may not be asserted for the first time, or reasserted, in post-conviction proceedings."). Therefore, the state PCR court held that it did not have the jurisdiction to consider the claim. J.A. 586–87. It also suggested to Wilson that he pursue the claim directly with the South Carolina Supreme Court, rather than through post-conviction relief proceedings. J.A. 587 ("[T]he deferred action by the Supreme Court merely authorized that Court, not this court, in an appeal from the state PCR action, if any, to consider the matter *de novo.*").

■ A federal court may not issue a writ of habeas corpus if the prisoner in state custody has either failed to exhaust, *see* 28 U.S.C. § 2254(b), or procedurally defaulted, *see Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), his claim in state court. In light of the state PCR court's holding, we conclude that we are barred from reviewing Wilson's claim related to the QCRB report because Wilson failed to exhaust his claim on direct appeal in state court, and may have even abandoned it. As the state PCR court held, it is clear that Wilson was

barred by the doctrine set forth in *Drayton* from bringing this claim in state PCR court because he could have raised it in his direct appeal. *See Drayton v. Evatt,* 430 S.E.2d at 519. But this does not necessarily mean that Wilson is barred from raising it in his federal habeas petition: if Wilson exhausted his claim in state court on direct appeal, then the state court would have had an opportunity to address the claim, regardless of whether he raised it improperly in his state post-conviction hearing. Thus, absent other procedural hurdles, it would be ripe for habeas review.

Wilson, however, also failed to give the state courts a chance to pass on this claim in his direct appeal; first, by failing to object to the consideration of the QCRB report by the state trial court *in camera,* and then, by deferring consideration of his QCRB claim on direct appeal before the South Carolina Supreme Court and, finally, by failing to raise it with that court at a later date, Wilson deprived the state courts of the "opportunity to correct [the] constitutional violation" that he now alleges in federal court. *See Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (quoting *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950)). As such, he has yet to exhaust his claims in state court and, consequently, section 2254(b) forbids relief to Wilson on these claims at this juncture.[16]

## VII.

The state's final contention on appeal is that the district court erred in granting the writ to Wilson on the ground that he was not competent at the time that he

16. We note that this does not necessarily mean that Wilson may, at this time, raise his claims on direct review in South Carolina state court. Simply because the South Carolina Supreme Court allowed Wilson to "de-

fer" his claims thirteen years ago does not mean that it must allow Wilson to raise them now after the passage of more than a decade. This is a matter of South Carolina's procedural law, as to which we offer no opinion.

868

entered his guilty plea. Again without applying the deferential standards of review required by section 2254(d), the district court held that "the petitioner was denied the right to be competent at all stages of the trial and that he was denied the due process of law." J.A. 552. Because we conclude that the state trial court's factual and legal conclusions as to Wilson's competency to enter a guilty plea were not "objectively unreasonable," we hold that the district court erred in granting the writ on this ground as well.

The state PCR court based its denial of Wilson's claim, in part, on its finding that Wilson was barred from presenting this claim in post-conviction relief proceedings because he could have, but did not, raise the issue on direct appeal. J.A. 626–27 (citing *Drayton v. Evatt*, 312 S.C. 4, 430 S.E.2d 517, 520 (1993)). The state raised the issue of procedural default before the district court as a defense to Wilson's habeas corpus petition, *see* J.A. 152 n. 18, but the district court failed to address it in its order granting relief. This was error. "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Notwithstanding the apparently dispositive effect of Wilson's procedural default in state court, the state did not raise this issue before us. And, because Wilson's procedural default in state court does not deprive a federal court of jurisdiction over Wilson's substantive claim, we are not required to consider Wilson's default *sua sponte*. *See Trest v. Cain*, 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997). Rather, the decision of whether "to decide a petitioner's claim on the basis of procedural default despite the failure of the state to properly preserve the procedural default" rests in our discretion. *Yeatts v. Angelone*, 166 F.3d 255, 261–62 (4th Cir.1999).

We decline to exercise that discretion here. Balancing, as we must, "the interests of comity and judicial efficiency that transcend the parties" against "the petitioner's substantial interest in justice," *id.*, we conclude that, in this case, the interest in judicial efficiency, as well as Wilson's interest in "be[ing] afforded notice and an opportunity to [ ] address the issue," *Yeatts*, 166 F.3d at 262, would be better served by our consideration of his claim on the merits. Not only is Wilson's substantive claim "patently without merit," and therefore easily disposed of, *see id.* at 261; but, in addition, the parties did not address the effect of Wilson's procedural default in their briefs or at oral argument, *compare id.* at 262 (deciding to address the petitioner's procedural default where the issue was "thoroughly briefed and argued") *with Roach v. Angelone*, 176 F.3d 210, 215 n. 3 (4th Cir.1999) (declining to disregard state's waiver where the petitioner had not been provided the opportunity to address the issue of his procedural default), leaving this court either to construct out of whole cloth the arguments of both the state and the petitioner on the issue or to order additional briefing to allow the parties the opportunity to argue the issue themselves. *Cf. Trest*, 522 U.S. at 91, 118 S.Ct. 478 (observing that, where the parties have failed to brief the procedural default question, the "somewhat longer (and often fairer) route" is to "ask for further briefing"). We do not believe that either route would be a fruitful use of our time in this case

and, instead, proceed to the merits of Wilson's claim.

Doing so, we conclude not only that Wilson has failed to show that the state trial court's competence determination was "objectively unreasonable," but, in fact, has failed even to show that it was wrong. The state trial court took special care to ascertain that Wilson was competent, and its inquiry into his competence produced *no* evidence that he was mentally unfit to stand trial. These efforts more than satisfied the state court's obligations to determine Wilson's competence to enter his guilty plea under clearly established Supreme Court precedent. *See Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

Although both the prosecution and the defense were willing to stipulate to Wilson's competence, the state trial court elected to conduct a competency hearing before beginning the guilty plea hearing. J.A. 916. In the hearing, the state trial court interviewed Dr. McKee and Wilson to ensure that Wilson was, in fact, of sound mind to proceed, under the standards set forth in *Drope,* and interviewed Dr. Donald Morgan and Lieutenant James L. Fowler to determine whether Wilson's medication affected his capacity to understand the trial or assist his counsel.

These interviews produced overwhelming evidence that Wilson was competent to stand trial, that he understood the proceedings against him and that he could assist his attorneys. *See id.* at 171, 95 S.Ct. 896. Dr. McKee informed the court that he had evaluated Wilson on the morning of his testimony for the express purpose of determining his competence and, as in November 1988 and February 1989, had concluded that Wilson was "competent to stand trial, that he underst[ood] the proceedings against him and [was] capable of assisting his attorneys in his defense." J.A. 920. Next, in a colloquy with the

court, Wilson himself assured the court that this was true.

Thereafter, in response to a question from the court, Wilson stated that he was taking anti-depressants and a tranquilizer. J.A. 933–34. The trial court then postponed its determination on competence to hear additional evidence regarding the effect that the medication had on Wilson. The next day, Dr. Donald Morgan testified that Wilson's medication, "improved [Wilson's] ability to" "understand the nature of the proceedings, to answer questions by the court, or other individuals, and to assist his counsel." J.A. 956. Dr. Morgan also told the court that, on that morning (April 25, 1989), Wilson was "more alert, more verbal, more cooperative than any of the previous times that I have examined him." J.A. 956. On this basis, the state trial court found, "as a fact beyond a reasonable doubt that this defendant is competent to stand trial, to understand these proceedings, to understand the nature of the charges against him, and the possible punishment, and that the defendant is able to assist his attorneys in these and other proceedings. The court, therefore, finds that the defendant is competent." J.A. 962. We believe this finding to be eminently reasonable, even compelled, in light of the lack of competing evidence before the state trial court.

Wilson asserts that the state trial court was nevertheless wrong to rely on this evidence because Wilson's counsel harbored private concerns that Wilson was "teetering on the brink" of competence, which they did not present to the trial court during the competency hearing. Wilson claims that these concerns were brought to the attention of the state trial court through comments made by counsel David Belser during a hearing on February 16, 1989, in which Belser opposed a motion for continuance on the ground that

Wilson may not be competent at a later date. Wilson also faults Belser for preparing, but not filing, a motion for a new competency evaluation on the eve of his guilty plea hearing, and for failing to inform Doctors McKee and Morgan of certain acts that may have affected their belief that Wilson was competent.

None of this is evidence that the state trial court erred in finding Wilson to be competent. The state trial court conducted an independent hearing, in which it interviewed two medical experts, McKee and Morgan, both of whom had conducted evaluations of Wilson on the day of their testimony. Morgan even testified that Wilson appeared to be "more alert, more verbal, more cooperative than any of the previous times that [Morgan] had examined him." J.A. 956. Moreover, the state trial court addressed Wilson separately to confirm the testimony of doctors McKee and Morgan. Regardless of any private misgivings harbored by Wilson's counsel, we conclude that these evaluations were sufficient to establish Wilson's competence on the day of trial and the state trial court did not err in relying on them.

## VIII.

Wilson contends on appeal that the district court erred in denying him a writ of habeas corpus on his claim that his sentence of death constituted "cruel and unusual punishment" under the Eighth and Fourteenth Amendments. In particular, Wilson claims that it violates the Eighth and Fourteenth Amendments to execute an individual judged by a court to have "lack[ed] sufficient capacity to conform his conduct to the requirements of the law." *See* S.C.Code § 17–24–20(A). The South Carolina Supreme Court considered and rejected this claim in *State v. Wilson,* 306 S.C. 498, 413 S.E.2d 19 (1992).

We may not grant habeas relief to Wilson on this claim unless we determine that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In this case, "the governing legal principles" that applied to Wilson's claim "at the time the state court reached its decision," were set forth in the Supreme Court's decision in *Penry v. Lynaugh,* 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *See Lockyer v. Andrade,* 538 U.S. 63, ——, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003). Under the principles set forth in *Penry,* a court was required to first determine whether the punishment was considered "cruel and unusual" at the time that the Bill of Rights was adopted, and, second, to determine whether the punishment violated "evolving standards of decency," as defined by "objective evidence of how our society views a particular punishment today." *Id.*

■■■ Because these were the principles that the South Carolina Supreme Court applied in its consideration of Wilson's claim, we find that its decision was not "contrary to ... clearly established Federal law." Thus, we must decide whether the South Carolina Supreme Court unreasonably applied the principles set forth in *Penry* to Wilson, who lacked the ability to conform his conduct to the requirements of law, but who could recognize legal right from legal wrong. In conducting this inquiry, it is not sufficient that we believe the state court applied the governing federal law incorrectly. Rather, the state court's application must have been "objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495.

Wilson does not contest the state court's application of the first prong of the *Penry* test, in which the state court held that the long-standing common law prohibition against executing "idiots" applied only to

individuals "who had a total lack of reason or understanding, or an inability to distinguish between good and evil," *Penry*, 492 U.S. at 331–32, 109 S.Ct. 2934, not individuals, like Wilson, who acted as a result of an "irresistible impulse." Rather, Wilson disagrees with the South Carolina Supreme Court based on its review of the "evolving standards of decency," as demonstrated by objective factors at the time it adjudicated Wilson's claim.

The state court's consideration of these objective factors rested heavily on the number of states in which it was possible for individuals, who were not insane under the *M'Naghten* standard but who nevertheless committed their crime as a result of an "irresistible impulse," to be executed. *See Wilson*, 413 S.E.2d at 26. This reliance was clearly appropriate, in light of both Supreme Court precedent, *see Penry*, 492 U.S. at 331, 109 S.Ct. 2934 ("The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."), and, as discussed below, the limited reliability of other objective factors. Looking to the states, the state court found that, although only three states had expressly sanctioned the execution of these individuals, fourteen more appeared to have no legal mechanism even to identify individuals acting pursuant to an "irresistible impulse," much less protect them from execution.

The South Carolina Supreme Court did not accept Wilson's assertion that juries rarely sentenced individuals like him to death, because that assertion was based only upon a review of individuals sentenced to death in the three states that expressly allowed for individuals in Wilson's position to be sentenced to death, South Carolina, Delaware and Pennsylvania. The court found that this picture was incomplete based on its finding, explained above, that the vast majority of states that allowed individuals like Wilson to be exe-cuted did not have legal procedures to identify someone suffering from an "irresistible impulse," but not insane under the *M'Naghten* standard. Thus, based on the only sound objective evidence before it, the state court concluded that it was "unconvinced that Wilson has proven a national consensus exists against the imposition of the death penalty" upon persons like Wilson. *Wilson*, 413 S.E.2d at 26–27.

Wilson argues in his appeal that a national consensus does exist against the execution of individuals who lacked the capacity to conform their conduct to the law; he bases this assertion on his identification of nineteen states in which "the trial court's fact finding concerning [Wilson's] volitional capacity would have shielded" him from a sentence of death. *See* Petitioner's Br. at 106. In seventeen of these states, Wilson claims that an individual found to act pursuant to an "irresistible impulse" would be protected from all criminal responsibility and all punishment.

We do not believe that this evidence establishes that the South Carolina Supreme Court's conclusion was "objectively unreasonable." As an initial matter, Wilson's argument is based on evidence of the states' contemporaneous policies, not the states' policies in 1992; therefore, to the extent that the states' policies have evolved in the last decade, Wilson asks that we evaluate the reasonableness of the state court's decision based on evidence that was not available to the state court itself. We need not evaluate the effect of this error on the evidence that Wilson presents, however, because we find that, even accepting that each of the states that Wilson relies upon had the same policy in 1992, the fact that nineteen states would not have allowed Wilson to receive the death penalty does not, standing alone, establish a national consensus against the execution of individuals like Wilson. At

best, it demonstrates that the number of states where the execution of such individuals was not possible roughly equaled the number of states in which the South Carolina Supreme Court found that such individuals could have been executed.

"It is the heavy burden of [the defendant] to establish a national consensus against" the imposition of a penalty that the citizens of a state have voted to impose. *See Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). We conclude that it was not "objectively unreasonable" for the South Carolina Supreme Court to conclude that Wilson failed to carry this heavy burden. Therefore, the district court's denial of habeas relief to Wilson on this ground was proper.

## CONCLUSION

For the reasons stated above, the judgment of the district court granting the writ of habeas corpus is vacated. The case is remanded with instructions that Wilson's petition be dismissed.

*VACATED AND REMANDED*