PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DARICK DEMORRIS WALKER,
　　　　　　　*Petitioner-Appellant,*

　　　　　v.

PAGE TRUE, Warden, Sussex I State
Prison,

　　　　　　　*Respondent-Appellee.*

No. 04-22

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-01-1196-A)

Argued: February 2, 2005

Decided: March 25, 2005

Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Luttig wrote the majority opinion, in which Judge Williams joined. Judge Gregory wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Edward Nathan Siskel, WILMER, CUTLER, PICKERING, HALE & DORR, L.L.P., Washington, D.C., for Appellant. Robert Quentin Harris, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** David P. Donovan, WILMER, CUTLER,

PICKERING, HALE & DORR, L.L.P., McLean, Virginia; David W. Ogden, Lara Ann Englund, Eric J. Hougen, Kurt W. Meyers, WILMER, CUTLER, PICKERING, HALE & DORR, L.L.P., Washington, D.C., for Appellant. Jerry W. Kilgore, Attorney General of Virginia, Richmond, Virginia, for Appellee.

---

**OPINION**

LUTTIG, Circuit Judge:

Appellant Darick Demorris Walker was convicted by a jury of capital murder and sentenced to death in a Virginia state court. In his federal habeas petition, he challenges his death sentence on the grounds that his trial counsel was ineffective for failing to investigate evidence of the mitigating factor of mental incapacity due to organic brain dysfunction or mental retardation. We granted a certificate of appealability to review the district court's dismissal of Walker's habeas petition. Because we conclude, as did the district court, that the state court's application of *Strickland* v. *Washington*, 466 U.S. 668 (1984), was not unreasonable, we affirm.

I.

Based on the jury's verdict, the Virginia Supreme Court found the following facts surrounding Walker's crimes. On November 22, 1996, Walker kicked in Stanley Beale's locked front door, and entered Beale's apartment yelling, "[W]hat you keep coming up to my door, what you come looking for me for?" *Walker* v. *Virginia*, 515 S.E.2d 565, 568 (Va. 1999). When Beale told Walker that he did not know who Walker was or where he lived, Walker began shooting at Beale as the other residents of the apartment hid in another room. *Id*. Walker shot Beale three times, killing him. *Id*.

On June 18, 1997, Walker kicked open the door to the residence of Andrea Noble and Clarence Threat. *Id*. at 569. Walker hit Noble with the gun and shot Threat in the leg. *Id*. After Walker and Threat exchanged words, Walker began to shoot Threat again. *Id*. Walker shot Threat a total of seven times. Threat died as a result. *Id*.

Walker was indicted in Virginia state court for capital murder, for four counts of the use of a firearm in the commission of a felony, and for two counts of burglary. J.A. 301. After a jury trial, Walker was convicted on all counts. J.A. 301.

Through the presentation of mitigating evidence at Walker's sentencing hearing, his trial counsel, Rebecca Norris, sought to establish that Walker was not a future danger because he responded well when placed in structured environments. J.A. 19-21, 296. She also attempted to demonstrate that his family cared whether he lived or died. J.A. 295. In support of her mitigation theory, Norris entered Walker's school records into evidence. Psychological reports included in the school records described Walker as a "slow learner" or "very slow learner," and suggested that he had a learning disability or attention deficit disorder. J.A. 151-53, 160, 203-05. Norris argued that the records revealed that, despite Walker's problems, his grades improved when he was placed in special education classes. J.A. 296. Norris also presented as witnesses Walker's jailers, who testified that he was a well-behaved inmate. J.A. 296. Finally, Norris presented Walker's family members, who testified about their affection for Walker. J.A. 296.

After a sentencing hearing, the jury recommended that Walker receive the death penalty for capital murder, life imprisonment for each burglary, and eighteen years of imprisonment for the firearms offenses. J.A. 301. The trial court sentenced Walker in accordance with the jury's recommendation, *id.*, and Walker's sentence was upheld on direct appeal. *Walker* v. *Virginia*, 515 S.E.2d 565 (Va. 1999), *cert. denied*, 528 U.S. 1125 (2000).

In his subsequent state post-conviction proceedings, Walker claimed that his Sixth Amendment right to counsel was violated by Norris' unreasonable failure to investigate adequately possible indications of organic brain deficiency or mental retardation referenced in a 1984 psychological examination. J.A. 238-40, 303. Walker argued that Norris' failure to investigate resulted in her failure to discover and present evidence of Walker's "severe mental impairment." J.A. 45. In support of his claim, Walker offered an affidavit from Dr. Scott Sautter which described Walker's brain dysfunction as "chronic" and

concluded that his non-verbal judgment and reasoning were in the first percentile. J.A. 233.

Walker's claim thus relied principally on the 1984 psychological evaluation, which was included in his school records. This report described Walker as making an error that "is most commonly found in protocols of individuals who are mentally retarded or who have some type of organic deficiency," and as drawing a picture that "indicate[d] either psychological regression with grossly impaired reality contact or organic involvement." J.A. 167-69. The evaluation recommended that Walker "receive a complete psychological evaluation in one year to evaluate his intellectual development and to rule out organic or psychotic disturbances that might be interfering with his adjustment." J.A. 169.

Although she possessed this limited evidence of the mitigating factor of mental incapacity due either to mental retardation or to organic brain dysfunction, Norris did not argue this mitigating factor to the jury. She concluded that the evidence in favor of organic brain deficiency was not likely to be persuasive, because there was only a single suggestion of such a problem in all of Walker's records, and neither her court-appointed expert, nor the facts of the crime, nor the testimony of witnesses supported that Walker suffered from such a problem. J.A. 294. In addition, Norris believed that arguing organic dysfunction would undermine the remainder of her mitigation strategy by supporting the government's argument that Walker would be a future danger in prison. J.A. 294. Likewise, Norris did not present evidence that Walker could possibly be mentally retarded because Walker's court-appointed psychologist, Dr. Randy J. Thomas, informed Norris that, based on his tests, Walker had an I.Q. of 86 and was thus not mentally retarded. J.A. 293.

Norris did not present as mitigating evidence the testimony of Dr. Thomas. Norris later alleged, and the Virginia Supreme Court found, that Dr. Thomas told Norris that he believed that Walker was a sociopath. J.A. 239. Dr. Thomas did not consider the 1984 psychological evaluation in reaching this conclusion, because Norris did not obtain the school records that included that report until three days before trial. J.A. 222. By the time Norris received these records, she had already determined that Dr. Thomas' belief that Walker was a socio-

path would render him ineffective as a witness in mitigation, and had thus removed him as an expert witness. J.A. 294. On post-conviction review, the state court concluded that the delay in Norris' receipt of the records stemmed from the "recalcitrance of Walker and his mother." J.A. 239.

The Supreme Court of Virginia rejected Walker's ineffective assistance claim on the merits, concluding that it "fail[ed] to satisfy the 'performance' prong of the two-part test set out in *Strickland*." J.A. 239-40. The Supreme Court of Virginia dismissed Walker's petition and the Supreme Court of the United States denied Walker's petition for writ of certiorari. *Id.*; *Walker* v. *True*, 534 U.S. 1003 (2001).

Walker then filed a petition for writ of habeas corpus in federal district court, alleging numerous grounds for relief, all of which the district court dismissed. J.A. 303-55. We denied a certificate of appealability as to the claim relevant here, *i.e.*, that trial counsel unreasonably failed to investigate mitigating evidence regarding his organic brain disorder or mental retardation. *Walker* v. *True*, 67 Fed. Appx. 758, 763 (4th Cir. 2003). The Supreme Court thereafter vacated our opinion and directed that Walker's case be reconsidered in light of *Wiggins* v. *Smith*, 539 U.S. 510 (2003). Upon remand to the district court, the district court again dismissed Walker's habeas petition on the grounds that counsel's failure to investigate was not unreasonable. Walker appealed the district court's dismissal of his petition, and we granted a certificate of appealability to review Walker's *Wiggins* claim.

## II.

The Virginia state court concluded that Walker was not entitled to relief on his ineffective assistance claim because Norris had extensively investigated possible mitigating evidence and presented a mitigation case to the jury based on tactical decisions that were the product of that extensive investigation. J.A. 238-40; *see also* J.A. 527-28, 541. Because Walker's claim was adjudicated by the state court on the merits, he is entitled to a writ of habeas corpus only if he satisfies the conditions set forth in 28 U.S.C. § 2254(d).[1] As rele-

---

[1]Walker argues that our review is not subject to the limitations of section 2254(d) because the district court concluded that the merits of his

vant here, section 2254(d)(1) permits the writ to be granted only if the state court adjudication resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[2]

A decision is an "unreasonable application" of Supreme Court precedent under section 2254(d)(1) if "the state court identifies the correct governing legal principle from [the Supreme Court]'s decisions but unreasonably applies that principle to the facts" of the case before it. *Wiggins*, 539 U.S. at 520. Because the state court correctly identified *Strickland* as the governing law, we must determine whether its application of *Strickland* was "incorrect or erroneous," and if so, whether it was also "objectively unreasonable." *Williams* v. *Taylor*, 529 U.S. 362, 409-11 (2000). We review the district court's conclusion that the state court's application of *Strickland* was reasonable *de novo*. *Hill* v. *Ozmint*, 339 F.3d 187, 193 (4th Cir. 2003).

In order to establish a claim under *Strickland*, Walker must show

---

claim that defense counsel conducted insufficient investigation "do not appear to have been addressed" by the state court. J.A. 337 n.17. While the state court did not address this claim at length, it did describe the claim and then note that the claim "fails to satisfy the 'performance' prong of the two-part test set out in *Strickland*." J.A. 239. The state court's disposition of a claim need not include extended analysis to qualify as an "adjudicat[ion] on the merits" under section 2254(d). *See* 28 U.S.C. § 2254(d); *Bell* v. *Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000) (en banc).

[2]Walker also contends that the Virginia Supreme Court incorrectly determined that Walker's recalcitrance caused the delay in Norris' receipt of the school records and thus that Walker is entitled to relief pursuant to 28 U.S.C. § 2254(d)(2) (permitting habeas relief where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding."). As the district court recognized, however, Walker did not present evidence to challenge the conclusion that he and his mother delayed Norris' ability to request the records. J.A. 537. Thus, he cannot show that the state court's determination that his recalcitrance was the reason for the late receipt of the records was an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

both that his counsel was deficient and that the deficiency was prejudicial.[3] Norris' performance was deficient only if her performance fell below an objective standard of reasonableness as determined by comparison to "prevailing professional norms." *Strickland*, 466 U.S. at 688. In evaluating this prong, "judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. Such deference applies equally to *Strickland* claims that allege failure to investigate, such as Walker's:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91.

In *Wiggins*, the Supreme Court, applying this passage from *Strickland*, rejected the contention that, if counsel has made a tactical decision not to present a particular type of evidence in mitigation, a limited investigation into that mitigating evidence is *per se* reasonable. Instead, the Court reasoned, it must be determined "whether the investigation supporting counsel's decision not to introduce [that mitigating evidence] . . . *was itself reasonable*."[4] *Wiggins*, 539 U.S. at

---

[3]Because we hold that counsel's performance was not objectively unreasonable, we do not reach the issue of prejudice.

[4]Contrary to Walker's contention, the *Wiggins* Court did not hold that counsel's decision not to present a particular type of mitigation evidence is *irrelevant* to whether counsel must further investigate, but only that counsel must have made an investigation sufficient to make a reasonable decision regarding what evidence to present. *See Wiggins*, 539 U.S. at 521-22, 527.

521-23 (emphasis in original). Additionally, of course, *Strickland* requires that the "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." 466 U.S. at 690-91; *see also Wiggins*, 539 U.S. at 524-25.

Walker alleges that Norris' performance was unreasonable because she failed to further investigate the possibility of organic brain deficiency, after the 1984 psychological report suggested at least the possibility of such.[5] We disagree.

Norris performed a thorough investigation, including into mental incapacity, prior to deciding not to conduct further investigation into the possibility of organic deficiency. Norris thus possessed considerable information against which to evaluate the indications of possible organic deficiency referenced in the 1984 psychological report.

Norris had investigated the particular mitigating factor of mental incapacity in some detail. She had reviewed Walker's school records, which included several psychological reports, investigated the circumstances of the crimes, interviewed Walker's family and Walker himself, and consulted a court-appointed mental health expert, who evaluated Walker's mental capacity. Norris had asked Walker and his mother to fill out a 26-page questionnaire (which was returned largely incomplete). She had requested from Walker a list of mitigation witnesses (which he did not provide). Though they did not exist, Norris had looked for social services records. She had interviewed Walker's girlfriends, wife, mother, brother, cousins, uncle, church group leader,

---

[5]Walker makes a half-hearted assertion that Norris' investigation was insufficient because of numerous steps that she did not take — such as not interviewing relatives other than the list of relatives Norris provides, and not acquiring records such as medical records and public housing records. However, he does not explain what evidence most of these records would have yielded, or why a reasonable attorney would have acquired them in this case. Instead, he simply cites the affidavit of the expert he acquired on habeas review, who alleges that such steps should have been taken and would have revealed mitigating evidence. J.A. 108. We therefore focus on the claim that Walker *does* outline in detail, *i.e.*, his claim that Norris' investigation into mental incapacity was insufficient in light of the 1984 psychological report.

and former lawyers and jailers. Norris had considered interviewing Walker's in-laws and friends, but Walker's wife had told Norris that her parents would not help and that Walker's friends were all "thugs" and would not come near a courthouse. Norris also had obtained church records and visited the houses in which Walker had grown up. Finally, she had consulted a court-appointed mental health expert, who had interviewed Walker and performed psychological testing. J.A. 291-96.

At oral argument, Walker's own counsel even conceded that Norris had investigated many "potential pieces" of an investigation into mental incapacity.

Paralleling her extensive investigation into possible mental incapacity, Norris had undertaken a much broader mitigation investigation as well. This investigation had led Norris to conclude that the fact that Walker performed well in structured environments represented the most effective mitigation possible. That Walker performed well in such environments, Norris had determined, was apparent from Walker's school records. It was a fact that Norris had confirmed through interviews with Walker's jailers. J.A. 296.

In light of the information known to Norris through this extensive investigation into mitigation, Norris' decision not to pursue further the possibility of organic brain deficiency was eminently reasonable.

In the first place, the 1984 report did not even conclude that Walker had an organic brain deficiency. Instead, it only raised the possibility of such and suggested that the possibility be "rule[d] out." J.A. 168-69. In the face of this tentative observation of possibility, Norris had amassed enormous amounts of information confirming, if not that Walker was not mentally impaired, certainly that he was not impaired to a degree that would be reasonably considered mitigating.

The particular manner in which Walker committed his crimes did not support a persuasive argument of mental impairment at the time of commission. J.A. 294. Of all the witnesses that Norris consulted, none suggested that Walker had at any time before the murders seemed to be uncontrollable. J.A. 294. Dr. Thomas' independent evaluation of Walker, which concluded that Walker had an I.Q. of 86,

contradicted the suggestion that he was mentally retarded. J.A. 293, 532. The remainder of the school records, including three psychological reports, notably failed to suggest any possibility of mental retardation or organic brain dysfunction, instead labeling Walker only a "slow learner." J.A. 151-53, 160, 203-05. Norris' own interactions with Walker did not suggest to her that he was mentally retarded. J.A. 293. Finally, the testimony of Walker's family, Norris had concluded, would not have supported an argument that Walker was somehow brain damaged. J.A. 294-95.

Walker appears to contend that his organic brain deficiency would have been mitigating precisely because it impairs his social skills and judgment, causes abnormal thinking and reasoning, results in an inability to experience emotions like a normal adult, and limits his capacity to perform everyday tasks. *See Br. of Appellant* at 45-50. Norris, however, had conducted a thorough investigation, through which she learned of Walker's ability to adapt to different environments, his interactions with others, his conduct surrounding the murders, and his mental capacities as evaluated by Dr. Thomas, and discovered no evidence of any such impairments, or at least none to an extent that would have reasonably be seen as mitigating.[6] In other words, even if Walker did have an organic brain deficiency, Norris was already in possession of substantial evidence that tended to confirm that that deficiency did not manifest itself in such a way as to permit a persuasive case in mitigation, if a case at all. Against the backdrop of this information learned by Norris through her extensive efforts to develop a case in mitigation, her decision not to reopen her investigation based on the tentative observation in the school report that organic deficiency should be ruled out, was both reasonable and fully consistent with *Wiggins*.

It is not even clear that exceptionally zealous counsel would have pursued the suggestion of an organic deficiency in Walker's psychological report, in light of the information known to Norris through her investigation. But, in any event, the Supreme Court has repeatedly

---

[6]These investigative steps could reasonably have been expected to reveal some of the problems that Dr. Sautter's affidavit ascribes to Walker, such as "impaired social reasoning and judgement" and "dysfunctional interpersonal relationships." J.A. 233-34.

emphasized that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. A petitioner can always highlight some possible further investigative action counsel could have taken; but "the reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation." *Byram* v. *Ozmint*, 339 F.3d 203, 210 (4th Cir. 2003). Norris had examined a great deal of evidence in mitigation, and believed that an argument that Walker was unable to control his behavior would tend to support the government's argument that he constituted a future danger, rather than support the arguments in mitigation that she had decided upon. J.A. 294. Norris decided to allocate her resources to building this mitigation case, focused upon Walker's family and Walker's responsiveness to structure, in light of her judgment that it was highly unlikely that a persuasive case for mental incapacity existed. This decision was made after extensive investigation into mitigation generally and the mitigating factor of mental incapacity specifically, and grounded in the realization that the only evidence that any mental incapacity might even exist was weak when weighed against the substantial evidence that such incapacity either did not exist at all or did not exist to such an extent that an effective case in mitigation could be built thereupon. It was a decision well within the bounds of reasonableness.

Our conclusion that Norris' performance was reasonable is confirmed by the considerable differences between her performance and that of Wiggins' counsel. Wiggins' counsel had consulted only three sources to prepare a mitigation case, none of which revealed detailed information about Wiggins' life history. *Wiggins*, 539 U.S. at 523. First, counsel had arranged for a psychologist to conduct tests on Wiggins, but the psychologist reported no evidence about Wiggins' life history. *Id.* Second, counsel reviewed a presentence investigation (PSI) report, which included a one-page summary of Wiggins' "personal history," noting that he had spent much of his life in foster care and that he described his background as "disgusting." *Id.* Finally, counsel reviewed the records of the Baltimore City Department of

Social Services documenting Wiggins' time in foster homes, including his physical and sexual abuse. *Id*.

The Court concluded that this investigation was insufficient to support counsel's decision not to introduce evidence of Wiggins' life history, as it gave counsel "only rudimentary knowledge of [Wiggins'] history from a narrow set of sources." *Id*. at 524. Norris, in contrast, consulted multiple sources to acquire a wide-ranging knowledge of Walker and the crimes he committed.

The Supreme Court also held that Wiggins was entitled to relief because counsel's limited investigation uncovered evidence that Wiggins suffered a troubled childhood, and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id*. at 525. Norris had no such evidence before her of possible mitigating factors that she had not considered; instead, the evidence she failed to further investigate concerned a mitigating factor, mental incapacity, that she had already extensively investigated and found to be either not present or not useful in mitigation.

We have recognized previously that *Wiggins* does not require that the court grant the writ in cases in which, in contrast to *Wiggins*, counsel has undertaken extensive investigation. *See*, *e.g.*, *Wilson* v. *Ozmint*, 352 F.3d 847, 864-65 (4th Cir. 2003) (distinguishing *Wiggins* on the grounds that Wilson's counsel performed a thorough investigation, even if counsel did not hire a social service worker to conduct an extended family history investigation); *Tucker* v. *Ozmint*, 350 F.3d 433, 441 (4th Cir. 2003). As our review of Norris' investigation makes clear, this is such a case.

Finally, it is notable that, in contrast to *Wiggins*, there is no indication that Norris' failure to investigate brain dysfunction any further was anything other than a reasoned strategic decision. *Cf. Wiggins*, 539 U.S. at 526-27. Unlike the failure of Wiggins' counsel to pursue a coherent strategy that explained their investigation into mitigating evidence, Norris' approach at the sentencing hearing, where she introduced the school records and presented testimony to support the fact that Walker's performance improved when he was placed in classes

for learning disabled students, was fully consistent with her avowed strategy of focusing on Walker's responsiveness to structure.

Norris thus performed an investigation into mental incapacity that was reasonable under all the circumstances, and substantially distinguishable from that in *Wiggins*. This is not to say that Norris' investigation definitively disproved the existence of an organic brain deficiency; certainly it did not. It is only to say that no more than this investigation was required in order for Norris' performance to be reasonable.[7] Under these circumstances, the state court's decision that she was not ineffective was not an unreasonable application of *Strickland*.

## III.

Walker argues that if we do not grant the writ of habeas corpus, we must at least grant him an evidentiary hearing. The district court denied Walker's motion for an evidentiary hearing, and we review this denial for abuse of discretion. J.A. 352-54, 542; *Hill* v. *Ozmint*, 339 F.3d 187, 193 (4th Cir. 2003).

A petitioner will not, absent the fulfilment of certain statutory requirements, receive an evidentiary hearing in federal district court

---

[7]Walker also alleges that Norris' failure to commission a social history report is contrary to ABA standards, rendering her performance *per se* unreasonable and entitling him to relief. But the Supreme Court has expressly held that the *Strickland* inquiry does not entail the application of *per se* rules. *See Strickland*, 466 U.S. at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."). *Compare Kandies* v. *Polk*, 385 F.3d 457, 470 (4th Cir. 2004) (opinion of Gregory, J.) (refusing to adopt a *per se* rule that counsel must hire a mitigation expert because the Supreme Court has rejected any "rigid checklist" of requirements for defense counsel and because a mitigation expert is "by no means the only manner through which defense counsel can thoroughly investigate a defendant's background"). Because Norris gathered extensive information about Walker's history from numerous sources, including his family members and school records, her failure also to obtain a social history report is not unreasonable.

"if the petitioner 'failed to develop the factual basis of a claim' in state court." *Fullwood* v. *Lee*, 290 F.3d 663, 681 (4th Cir. 2002) (quoting 28 U.S.C. § 2254(e)(2)). Neither party suggests that the bar of section 2254(e)(2) is implicated by this case. Although section 2254(e)(2) thus does not bar an evidentiary hearing, Walker is still not entitled to such a hearing unless he "alleges additional facts that, if true, would entitle him to relief." *Id.* (quoting *McCarver* v. *Lee*, 221 F.3d 583, 598 (4th Cir. 2000)). Walker must also satisfy one of the six factors the Court identified in *Townsend* v. *Sain*, 372 U.S. 293, 312 (1963).[8] *See Fullwood*, 290 F.3d at 681.

Here, Walker is not entitled to an evidentiary hearing because he has not alleged any facts which, if true, would entitle him to relief. Although he generally alleges that Norris' investigation was not reasonable and that her attempts to gather information were "limited and inept," Walker does not dispute, and certainly offers no evidence to contradict, Norris' representations as to the specific steps she took to investigate possible mitigating defenses.[9] Instead, his most relevant factual contentions allege only that Norris failed to take numerous further investigatory steps that she does not allege she took; that she,

---

[8]Those factors are as follows:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Fullwood*, 290 F.3d at 681 n.7 (quoting *Townsend*, 372 U.S. at 313).

[9]The one fact alleged by Walker that is arguably inconsistent with Norris' account of her investigation is that Norris did not diligently pursue the receipt of the school records, and had the necessary information to acquire the records earlier than she did. Because Norris did review the records prior to trial, however, and reasonably concluded after reviewing the records not to further pursue mental incapacity as a mitigating factor, the timing of the receipt of the records is not relevant to the reasonableness of Norris' investigation.

not he, was to blame for the delay in the receipt of the school records; and that Dr. Thomas would have come to a different conclusion regarding Walker's mental capacity had he been presented with the school records. Because we have concluded that the investigation into mental incapacity recounted by Norris and not disputed by Walker was reasonable, these facts, even if true, would not change our application of *Strickland*. The district court thus did not abuse its discretion in denying Walker an evidentiary hearing.

## CONCLUSION

For the reasons stated, the judgment of the district court is affirmed.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

With new information can come new duties to investigate. The issue here is not whether Walker's counsel conducted an appropriate initial investigation. Rather, it is whether, once this investigation uncovered some evidence of organic brain dysfunction, Walker's attorney pursued this lead as would a reasonably competent and diligent attorney. She did not, so I respectfully dissent.

One passage of the majority opinion succinctly captures the five fundamental flaws in the purported reasoning of Ms. Norris, Walker's lead counsel. It states that she

> (1) concluded that the evidence in favor of organic brain deficiency was not likely to be persuasive, because there was only a single suggestion of such a problem in all of Walker's records, and (2) neither her court-appointed expert, (3) nor the facts of the crime, (4) nor the testimony of witnesses supported that Walker suffered from such a problem. In addition, (5) Norris believed that arguing organic dysfunction would undermine the remainder of her mitigation strategy by supporting the government's argument that Walker would be a future danger in prison.

*Ante* at 4 (citations omitted, numbers added). Close analysis of these five claims (which are simply unquestioned restatements of Norris's version of things) reveals why Walker's counsel's conduct was both deficient and prejudicial under *Strickland* and *Wiggins*.

*First*, Walker's counsel could not have reasonably *concluded* that an organic brain dysfunction argument was not likely to be persuasive unless she had first fully *investigated* and diligently *developed* that evidence. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (rejecting counsel's "attempt to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead"). Norris was put on notice of Walker's mental deficiencies by his school records, which contained a psychiatric evaluation stating that he committed errors that revealed "significant delays in perceptual motor development," J.A. 167, and that his visual-motor errors were "most commonly found in protocols of individuals who are mentally retarded or who have some type of organic deficiency." J.A. 168. This report also revealed that Walker showed signs of "either psychological regression with grossly impaired reality contact or organic involvement," and recommended that Walker be tested again for organic or psychotic disturbances. J.A. 169. Yet these were not the only references to organic mental deficiencies. When Walker was in third grade, an educational diagnostician presaged the psychiatrist's findings by noting Walker's inability to exercise fine motor-integration skills and copy simple shapes and words. J.A. 150. A psychological examination administered in 1982 revealed that Walker

- had a "severe deficit" in visual perception,

- exhibited "considerable difficulty differentiating essential from nonessential details in pictures (visual discrimination) as well as copying simple marks with speed and accuracy,"

- "had a great deal of difficulty reproducing abstract block designs," and, in fact, failed to complete a single design,

- "made numerous integration and rotation errors," and

- rendered "extremely poor" drawings.

J.A. 152.

Once Norris received the school records, a new duty to investigate arose. Purported time pressure — whoever caused it — can be no excuse; a reasonable attorney would have at least asked for a continuance. Instead, she scuttled an investigation that, according to Dr. Scott W. Sautter, the neuropsychologist retained by Walker's habeas counsel to examine Walker, revealed that Walker suffers from

> chronic and severely impaired right hemisphere mediated skills, observed in childhood and manifested as impaired complex attention required to shift problem solving strategies as task demands changed, constructional and drawing skills, non-verbal reasoning and social judgement leading to emotional maladjustment and dysfunctional interpersonal relationship.

J.A. 233. Specifically, Walker's severe impairment resulted in: "grossly intact" visual and auditory acuity, "severely deficient" visuomotor tracking, visual-spatial and constructional function, design reproduction, writing skills, factual knowledge, and non-verbal abstract reasoning and non-verbal visual learning. J.A. 231-32. Sautter also diagnosed Walker with "chronic attention and learning disabilities" and "impaired social reasoning and judgement." J.A. 234. He stated that Walker's "impaired non-verbal reasoning and judgement certainly contributed to the sequence of events that led up to his actions." J.A. 233; *see generally* J.A. 227-35. The capability and will to follow new leads as they arise, even at a late date, are part of the irreducible minimum for a constitutionally acceptable defense lawyer. Norris failed to meet this minimum.

*Second*, Walker's counsel cannot know whether her court-appointed expert would have supported the existence of organic brain dysfunction because *he never tested for it and she never gave him the evidence that would raise this probability*.[1] Dr. Thomas stated that he

---

[1]Dr. Thomas interviewed Walker and administered an IQ test. Dr. Sautter, however, noted that:

"really need[ed] the school records," J.A. 136, and noted that his con-
clusions were subject to change "if further relevant information
becomes available to me." J.A. 221. Thomas also took care to include
in his report that, "[i]t should be noted that the defendant's school
records have been requested, but not received at the present time."
J.A. 222. He never received them. In the face of this, the majority
states that by the time Norris received these records, she had already
determined that Dr. Thomas would not be a good witness. This is, of
course, just the kind of premature foreclosure of investigation that
*Wiggins* found inappropriate. Especially given Dr. Thomas's request
for Walker's school records and clear statement that his opinion was
subject to change, it was objectively unreasonable for Norris to
believe that Dr. Thomas could not have changed his opinion.

*Third*, the suggestion that "the facts of the crime" did not support
the idea that Walker suffered from organic brain damage can only be
called a red herring that distracts from the issue before us. Walker's
crimes, while undeniably horrible, were certainly not intricate frauds,
sophisticated bank heists, or anything else that necessitated consis-
tently unclouded high-level thinking. They were simply brutal, inex-
plicable murders. I have no idea how kicking in two apartment doors

> It is well known in the neuropsychological literature that IQ test-
> ing alone is insufficient to evaluate brain dysfunction, because
> one could have a normal IQ and yet be severely brain damaged.
> Without a complete history of Mr. Walker's school records, that
> clearly document attention and learning disabilities that suggest
> neurologic compromise in normal development, Dr. Thomas
> may not have been able to fully appreciate the extent of probable
> brain dysfunction and its contribution as mitigating factors.

J.A. 227.

Indeed, the absence of school records undermines Thomas's purport-
edly unalterable diagnosis that Walker was a "sociopath." Dr. Sautter
found "no evidence of antisocial personality disorder, or attempts to
manipulate the examiner," and notes that "[w]ithout documentation of a
conduct disorder as a child a diagnosis of antisocial personality disorder
cannot be made. Further, when brain dysfunction is present this becomes
the prominent diagnosis from which other problems are attributed." J.A.
233.

and shooting people — "the particular manner in which Walker committed his crimes," *ante* at 9 — could possibly constitute *any* evidence for the proposition that Walker was not brain damaged. If this indeed formed a basis for Norris's decision not to investigate, it was unreasonable.

*Fourth*, Norris and the majority would have us believe that it is relevant that the witnesses Norris interviewed evidently did not diagnose Walker with organic brain damage. But these people were not experts and neither was Norris. Even severe mental diseases can be both crippling (and thus mitigating) *and* hidden from, or misdiagnosed by, lay observers; that is why we have experts to test for these things.[2] Here, one such expert explained that Walker exhibited signs of organic brain damage that required further testing while another told Norris that he "really need[ed]" the very records that contained the first expert's opinion. It was patently unreasonable for Norris to ignore their opinions, particularly when a third expert — Dr. Sautter, who *did* have the information Thomas requested — tested for and found extensive brain damage.

*Finally*, the majority tells us that "Norris believed that arguing organic dysfunction would undermine the remainder of her mitigation strategy by supporting the government's argument that Walker would be a future danger in prison." *Ante* at 4. As the majority recognizes, *ante* at 9, and Norris admits, J.A. 296, the defense had and presented evidence indicating that Walker responded well to structured environments and had a good prison record. Of course a man can *both* suffer from organic brain dysfunction *and* respond well to structure; Dr.

---

[2]Dr. Sautter's report reveals that Walker himself "demonstrate[d] an over-rating of his abilities and an unawareness of the extent of his cognitive deficits." J.A. 233. He went on to note that

> Because Mr. Walker's verbal abilities are better developed he superficially appears to others as being far more capable socially than he is able to demonstrate. His glib, self-assuredness is a means to compensate for severely impaired skills in interpersonal relationships, constructional skills, non-verbal reasoning, and non-verbal memory.

J.A. 233.

Sautter, in fact, found just this. He recommended that "Mr. Walker would benefit from a highly structured and routine environment, so that he is not permitted complete independent decision-making in daily living," and noted that Walker had worked well and would likely continue to do so in the structured environment of the prison laundry. J.A. 234.

I am perfectly aware that *Strickland* precludes us from second-guessing all of an attorney's strategic decisions with hindsight's aid. Rather, we defer to the tactical choices of the people we presume are in the best position to make such decisions. But *Wiggins* rightly recognized that we can only put such significant faith in a lawyer's strategic choices if these decisions are undergirded with reasonably thorough investigations.

These choices were not. Here, an attorney received a good lead from her client's records — which her expert demanded but did not receive — that her client may suffer from organic brain dysfunction. She flatly admitted that "[t]he defense was aware, of course, that if Walker had some sort of organic brain problem this potentially could be 'mitigating.'" J.A. 294. Yet rather than properly pursue this information, she offered the precise kind of post-hoc "tactical choices" excuse the Supreme Court rejected in *Wiggins*. The majority commends all this as good enough for a capital case. I respectfully disagree. Accordingly, I would grant the writ to have Walker resentenced with the effective assistance of counsel guaranteed by the Constitution.